## BERNICE R. MOORE v. CURTIS C. BOWMAN.

A party setting up an equitable estoppel, *in pais*, is himself bound to the exercise of good faith and due diligence to ascertain the truth.

What is reasonable diligence is a question of fact for the jury under all the circumstances of the case, and they might sometimes find that the party setting up such estoppel could reasonably rely upon the representations made to him, without any inquiry whatever.

Where the goods of a debtor are mixed with those of another, but they are of such character that they may be identified and separated, it is the duty of an officer who is about to attach the goods of the debtor. to make reasonable inquiry to distinguish them before he would be justified in taking those of the other.

If in such case he should attach the goods of the other with the determination to hold them at all events, and not temporarily for the purpose of inquiry, he would be liable in trespass at the suit of the owner.

An officer who attaches such goods is not liable for exemplary damages, simply because he rashly and heedlessly took them, without taking due care to learn the rights of the plaintiff.

TRESPASS for taking the plaintiff's mare. Plea, the general issue, with a statement that the defendant, being a deputy of the sheriff, took the mare on writs against Azariah W. Moore as his property. On trial it appeared that the mare belonged to the plaintiff. There was no evidence that she was liable to be taken for the plaintiff's debt, or that he was in debt. It was proved that Azariah W. Moore was in embarrassed circumstances when the mare was attached, and had been for several years before. The attachment was made in the stable belonging to Knapp's hotel in Littleton, on the 8th of March, 1865.

On that day, Azariah W. Moore bought two horses of Orrin Bronson, at Landaff, professing to act as agent for his mother, and led the horses to a point half or three quarters of a mile above Lisbon village, where he tied and left them by the side of the highway leading to Littleton. He then rode with another horse to Lisbon village, where he met his son, John A. Moore, and his brother, the plaintiff. The plaintiff and John A. Moore came that morning from Lyman, where the plaintiff resided, with the mare which was afterwards attached.

At Lisbon village it was arranged that the plaintiff and John A. Moore should go to Littleton with the plaintiff's horse and sleigh, and on their way take with them to Littleton the two horses bought of Bronson. The plaintiff and John A. Moore started from Lisbon village, took the two horses bought of Bronson and led them behind the sleigh for about two and one half miles. They then took the plaintiff's mare out of his sleigh, and put in one of the Bronson horses, which was a large black mare, and after that led the other Bronson horse and the plaintiff's mare behind to Littleton. The plaintiff and John A. Moore testified that before the Bronson mare was put into the sleigh she was difficult to lead; that she pulled the man who led her twice out of the sleigh, and got away from them more than once; that this was the reason, and the only reason, why the shift of the horses was made.

The horses bought of Bronson were a large black mare and a small one. The plaintiff's mare was black; but the evidence did not tend to

show that, except in color, there was any close resemblance between her and either of the Bronson horses.

Azariah W. Moore started from Lisbon after his son and the plaintiff, passed them on the way to Littleton, and had the horse which he drove, and which was a bay mare, put in the stable at Knapp's hotel.

That day a telegraphic despatch was sent from Lisbon to Littleton, which was communicated to the defendant, informing him that Azariah W. Moore was on his way to Littleton with two horses, and directing him to attach them as the property of Azariah W. Moore.

Soon after the horse which A. W. Moore drove to Littleton was put in the stable, the plaintiff and John A. Moore arrived there and directed Herod Stevens, the hostler, to put the three horses they came with into the stable and feed them. There was no evidence that they or either of them gave the hostler any directions as to the manner in which the horses should be placed in the stalls, and they and the hostler testified that no such directions were given. The hostler put the plaintiff's mare and the small mare bought of Bronson in adjoining stalls near the door, and the other large Bronson mare in another part of the stable, several stalls distant.

The defendant, who was the only witness for the defence, testified that, after receiving the instructions before mentioned, he went to the stable and asked Stevens, the hostler, which of the three horses that came with the plaintiff were led ; that the hostler told him the two that were in the stalls together near the door ; that he then attached those two horses and directed Stevens to keep them for him. This was contradicted by Stevens, who testified that Bowman came and asked him to show the horses that the Moores brought ; that he showed him the horse that A. W. Moore came with, and then the other three, and told him they were the three the boys came with ; that the defendant looked at the horses and then told him he had attached the two that stood together next the door, and told him to keep them for him ; that nothing was said about the horses being led there.

The front part of the stable was divided from the back part by a partition, and the horses were put in the back part. The defendant testified that when he went to attach the horses, the plaintiff and John A. Moore were in the back part of the stable and had the large black Bronson mare out in the floor looking at her ; that they put her back into the stall, and went out of the back part of the stable before he attached the horses ; that as he was going out into the front part of the stable, he met A. W. Moore coming in, and gave him a summons, and pointed out to him the two horses which he had attached ; that the plaintiff and John A. Moore were in the front part of the stable at that time, and near by when he spoke with A. W. Moore. A. W. Moore testified that the defendant did not point out the two horses he had attached, and that he supposed the two horses bought of Bronson were those attached ; that neither the plaintiff nor John A. Moore were there when the summons was given him. The plaintiff, John A. Moore and Stevens, the hostler, testified that neither the plaintiff nor John A. Moore were in the

stable at all until about 6 o'clock, after the plaintiff called for his horse to go home.

The two horses were attached somewhere from three to four o'clock in the afternoon. The plaintiff testified that some time in the afternoon, he was told two of the horses were attached as his brother's, but that he supposed they were the Bronson horses, and had no information that his horse was attached till about six o'clock, when he directed the hostler to harness her. He and Stevens, the hostler, testified that, on being directed to harness his horse, the hostler told the plaintiff two of the horses were attached, and his horse might be one of them. That on going to the stable and seeing the horses attached, the plaintiff said one of them was his, and he must have her to go home to Lyman ; that at the plaintiff's request the hostler went out and found the defendant, and told him Bernice R. Moore claimed one of the horses attached, and said he had owned it for two years, and wanted he should give it up ; that the defendant told him to hold on to the horses he had put in his hands, and that he reported this to the plaintiff. The plaintiff testified that he then found his brother, Azariah W. Moore, and they went together to Mr. H. Bingham's office, and stated the case to him. The plaintiff, A. W. Moore and Mr. Bingham testified that by Mr. Bingham's advice, A. W. Moore went out to bring the defendant to the office ; that A. W. Moore came to the office with the defendant ; that Mr. Bingham, in the presence of A. W. Moore and the plaintiff, explained to the defendant the title of the plaintiff to the mare, and urged him to give up the plaintiff's mare and let him go home with her ; that the defendant, in answer to this, said that he was ordered to make the attachment, was indemnified and should not give up the horses he had attached, nor make any shift. There was evidence that after this and towards nine o'clock in the evening, the plaintiff, by advice of Mr. Bingham, and with the consent of A. W. Moore, took the other Bronson horse and drove him home to Lyman. It appeared by evidence on the part of the plaintiff, that both the Bronson horses remained in the stable until one of them was taken by the plaintiff to go home with. There was no evidence except that above stated, to show that the defendant inquired to ascertain which two were the Bronson horses.

The defendant testified that he supposed he had attached the two Bronson horses ; that he was not informed that the plaintiff made any claim to either of the horses attached, until, according to a previous arrangement made with Mr. Bingham, he went to acknowledge service of the writ in favor of A. W. Moore's mother, which he understood to have been made for his taking the two Bronson horses, when he was surprised to find there was another writ, for the plaintiff ; that he then understood for the first time that the plaintiff claimed to own one of the horses. The defendant's written acknowledgment of service was dated March 14, 1865, and Mr. Bingham testified that it was in fact made on that day.

The defendant rested his defence on two grounds :

1. That there was a fraudulent contrivance between the plaintiff and his brother, Azariah W. Moore, to induce the defendant to attach the

plaintiff's mare instead of one of the Bronson horses; that the defendant, by what was done in pursuance of this fraudulent contrivance, was deceived into the belief that the plaintiff's mare was one of the Bronson horses, and that, relying on the false representation and fraudulent conduct of the plaintiff, he attached the plaintiff's mare, believing her to be one of the Bronson horses.

2. That the plaintiff's mare was so mingled with the Bronson horses that he could not, by due diligence, ascertain which was the plaintiff's mare, and was not liable for taking her till the plaintiff should point her out.

At the commencement of his argument, the counsel for defendant read the following passage from *Taylor* v. *Jones*, 42 N. H. 36, and meant to be understood as requesting the court to charge the jury in accordance therewith :

"In *Lewis* v. *Whittemore*, 5 N. H. 366, it was expressly held, that an officer had a right to attach the goods of another, intermixed with those of the debtor, and hold them until they were identified by the owner, and a re-delivery demanded ; that he could not be treated as a trespasser for doing what he had a right to do ; that if, after identification and demand for re-delivery, he refused to give up the goods and proceeded to sell them, it would be a conversion for which trover would lie, but that trespass could not be maintained for the original taking."

The court instructed the jury, that, in order to make out the defence on the first ground, it must appear that the plaintiff, by his declarations, or his conduct, induced the defendant to believe that the mare was one of the Bronson horses ; that this must have been done by the plaintiff with the design to deceive and defraud, or in such circumstances that he was bound to suppose that it probably might deceive and defraud the defendant, or others, who were interested in the title to the mare ; that the defendant must have been in fact deceived and misled into the belief that the mare was one of the Bronson horses ; and that he must have used due diligence to ascertain the fact ; that if there was a conspiracy between A. W. Moore and the plaintiff, what was done by A. W. Moore in pursuance of the conspiracy would bind the plaintiff as much as if it had been done by himself.

On the second point, the court instructed the jury, that, in case the plaintiff ordered the hostler to put the three horses in the stable, without any direction as to the manner in which they should be placed there, and the hostler put them together in the stable accidentally, and as matter of convenience, if the defendant, meaning to attach two of the three horses as the property of A. W. Moore, and knowing that one of them did not belong to A. W. Moore, undertook to select two of them as the horses of A. W. Moore intending to hold them at all events, and finally, and not temporarily till he might get further information, and when informed that one of the horses belonged to the plaintiff, still insisted on holding the two which he had attached, he would be liable to the plaintiff in this action, provided there was no fraudulent design on the part of the plaintiff to procure his horse to be attached as the horse of A. W. Moore ; but the question as to the plaintiff's negligence on the fore-

going statement of facts, the court did not leave to the jury; and at the request of the defendant, the court further instructed the jury that it was a question for them to decide, whether defendant, when he went into the barn and selected the two horses that he would attach, meant to hold them at all events, and finally, and not temporarily, till he might get further information.

The plaintiff claimed exemplary damages. The court instructed the jury that, ordinarily, in trespass against an officer for taking the plaintiff's property on process against another party, the plaintiff would not be entitled to exemplary damages, but that in this case, if they found that the defendant rashly and heedlessly took the plaintiff's horse without taking due care to learn what the plaintiff's rights were, they might, if, looking to all the circumstances, they thought proper, give the plaintiff exemplary damages.

The defendant requested the court to instruct the jury that, in order to find exemplary damages, they ought to find that the defendant acted in bad faith, and knew that the horse belonged to the plaintiff. The court declined so to instruct the jury, but repeated the former instructions on this point.

The jury returned a verdict for the plaintiff. They found exemplary damages, and by consent returned separately $115, for the value of the horse and interest from the taking, and in addition $25, for exemplary damages.

The defendant moved to set aside the verdict for error in the foregoing instructions and refusal to instruct.

*C. W. & E. Rand*, for defendant, upon the question of the necessity of due diligence by defendant to ascertain which was plaintiff's horse, cited and commented upon *Rider* v. *Hathaway*, 21 Pick. 298; *Brinkerhoff* v. *Lansing*, 4 Johns. Ch. Rep. 65; *Davis* v. *Handy*, 37 N. H. 65; *Corbet* v. *Norcross*, 35 N. H. 116; *Wells* v. *Pierce*, 27 N. H. 511; *Ranlet* v. *Otis*, 2 N. H. 168; *Cate* v. *Cate*, 44 N. H. 211; 2 Starkie's Ev. 79.

Upon the question of the intermingling of the goods, they cited *Taylor* v. *Jones*, 42 N. H. 261, and cases cited.

*Binghams*, for the plaintiff, cited and commented upon *Drew* v. *Kimball*, 43 N. H. 282; *Wilson* v. *Lane*, 33 N. H. 476; *Holbrook* v. *Hyde*, 1 Vt. 301.

BELLOWS, J. If there was a fraudulent contrivance between the plaintiff and his brother, A. W. Moore, to induce the officer to attach the plaintiff's mare, instead of one of the Bronson horses, by holding out that mare to be one of those horses, either by representation or acts, and the officer, relying upon such holding out, had attached the mare, and suffered the Bronson horse to escape, the plaintiff would be estopped to set up title to the mare in himself. *Drew* v. *Kimball*, 43 N. H. 282. To have this effect, however, the defendant must actually have been misled by the plaintiff's conduct, and induced thereby to change his

position.   If he was not so misled, but still believed that the mare be-
longed to the plaintiff, or had reason to think so, and with a reasonable
use of means within his reach he might have ascertained the fact, he
could not set up an estoppel.    The truth is, the party setting up an es-
toppel is himself bound to the exercise of good faith and due diligence
to ascertain the truth ; and what is reasonable diligence is a question for
the jury upon all the circumstances of the case.    In some cases he might
reasonably rely upon the acts or representations of the party to be es-
topped, without any inquiry whatever.    In others, it would be gross
negligence and want of good faith not to make use of the means at hand
to ascertain the truth.

In *Odlin* v. *Gove*, 41 N. H. 479, which was a writ of entry to re-
cover a strip of land fifteen inches wide on the street on which defend-
ant had placed the walls of a building, and defendant attempted to set
up an estoppel, upon the ground that plaintiff stood by and saw the
building erected without objection, it was held, that if, under all the
circumstances, including the plaintiff's silence, the defendant unreason-
ably failed to use the means of ascertaining the boundaries which were
within his reach, he had no cause to complain : because, in cases of this
sort, he is to be charged with such knowledge as reasonable diligence
would have given him ; and it has been accordingly held that a prior
mortgagee of real estate who stands by and witnesses a second mort-
gage without objection, will not be postponed thereby, if his mortgage
was duly registered; see *Odlin* v. *Gove*, before cited, p. 477, and
cases.    Such is also the doctrines of *Carter* v. *Champion*, 8 Conn.
554; *Begalow & ux.* v. *Topliff & al.*, 25 Vt. 273 ; and *Brinker-
hoff* v. *Lansing*, 4 Johns. Ch. Rep. 63.    In the latter case it is said
by *Chancellor Kent* that it would require direct proof of intentional
deception and fraud on the part of Lansing, before he could be post-
poned to a subsequent purchaser, his, (Lansing's) mortgage, being duly
registered.    He does not, to be sure, say that if such intentional fraud
had been shown, Lansing's mortgage would be postponed ; nor did that
question arise, though it may fairly be inferred that such was the learned
Chancellor's opinion.

It may, however, be difficult to distinguish between the case as it
really existed, and what it would have been had intentional fraud been
shown.    In that case, Lansing's mortgagor leased part of the mort-
gaged lands for sixteen years, and Lansing was a subscribing witness to
the execution of the lease, with a knowledge of its contents, and with-
out any objection ; and it was held, that, as the mortgage was regis-
tered, the lessee was charged with constructive notice of it, and there
was no estoppel.   'If the mortgage had not been registered, Lansing
would have been estopped ; and upon the ground that his conduct amount-
ed to an affirmation that he had no title inconsistent with that which the
lessor was then conveying ; and it would, therefore, be a fraud in him
to attempt afterwards to set up his mortgage.    Whether at the time of
executing the lease he intended at a subsequent period to assert his mort-
gage title against the lessee, or not, would be entirely immaterial in re-
pect to the estoppel, for the fraud would consist in denying what he

had before affirmed by his conduct to be true, namely, that the lessor had a right to make a lease of the land, by which the lessee had been misled. As the mortgage in this instance was recorded, it might be urged that Lansing may have supposed that the lessee had knowledge of it, and therefore there would be more propriety in charging him with notice, than if Lansing had distinctly affirmed that he held no such mortgage, and something like this may have been the view of Chancellor Kent.

However this may be, we find no case that goes the length of enabling a party to set up an estoppel of this sort, when with reasonable attention to the means of information at his hand he would not have been misled. In the case before us, the evidence of fraud on the part of the plaintiff was not very explicit, and the circumstances stated are equivocal; and it was proper that the jury should be instructed that the defendant was bound to the exercise of reasonable diligence under the circumstances, in the use of means at his hands to ascertain the truth about the horses. If he rashly decided upon the matter, with a careless indifference to the means of information, reasonably within his reach, he would not be entitled to complain. 2 Kent's Com. 485. Such, as we understand it, was the charge of the judge, in substance. What would be due diligence, was for the jury.

In regard to the intermingling of the horses, no instructions were given, although that point was argued by defendant's counsel, and an authority cited, meaning to be understood as requesting the court to charge the jury in accordance with that authority. We think, however, that the instructions should be asked for in a way to leave it open to no doubt; and that if no instructions were given upon a particular subject, and the attention of the judge not called to it at the close of or during the charge, ordinarily it would be understood as waived.

If the horses were accidentally placed as they were in the stable, without fraud on the part of the plaintiff, and the defendant selected two as the horses of the debtor, and attached them, intending to hold them at all events, and not temporarily till he could get further information, and he insisted upon holding them after notice that one of them belonged to the plaintiff, he would be liable in trespass, if the horse did belong to the plaintiff, and he was not estopped to claim it by some fraudulent act on his part. Had the plaintiff's and the debtor's horses been intermingled so that the officer, using due diligence, could not distinguish them, he might, perhaps, take all and hold them until there was an opportunity to identify them; but his right to take possession and hold the plaintiff's horse would be limited by the occasion for it, and if, instead of taking it for the lawful purpose, he took it with the purpose of holding it at all events, he would be liable in trespass. The instructions on that point were, therefore, correct.

But it is urged that the two horses were so placed by the fault and negligence of the plaintiff, and that as the defendant was thereby misled, the taking was not unlawful. Had they been accidentally placed in adjoining stalls, it is quite clear that this would give the defendant no right to attach the plaintiff's horse as the property of the debtor, any

more than to sell it as such. He might have taken and detained the three horses a reasonable time till he could make inquiries and ascertain which belonged to A. W. Moore; but if, instead of that, upon the knowledge he already had, he selected these two, and attached them with a determination to hold them at all events, he would be liable to the plaintiff in this form of action, and could not justify the taking upon the ground of mistake, any more than if he had taken the plaintiff's horse alone. He would have power to detain the whole until he could make inquiry; but if he did not take and detain them for that purpose, he had no right to take the plaintiff's horse at all. This would be illustrated by the supposition that he took the plaintiff's horse upon the ground that his title was derived from the debtor, and that the sale was fraudulent as to the creditor.

It is clear, then, we think, that, in case the horses were so placed by accident, the defendant had no right to attach the plaintiff's horse. This is clearly the doctrine of *Kingsbury* v. *Pond*, 3 N. H. 513; and it is not, in fact, contested by defendant's counsel; but they urge that if the horses were so placed by the plaintiff's fault, the law is otherwise; and this position makes it necessary to look more closely to the law which governs the rights of the parties where there is a confusion of goods. If the goods are accidentally mingled, and they are of such character that they can be distinguished and separated, there will be no change of property, but each is entitled to his own; if they are of such a nature that they cannot be identified and separated, as corn, oil, wine, hay, &c., then each is entitled to his aliquot part of the entire quantity.

If goods are mixed by the negligence or inadvertence of one of two owners, and they are of such nature that they *can* be identified and separated, the property of each remains as before; and the law must be the same where the mixture is by the wilful act of one party, unless the purpose was fraudulent. As if A. mixes some of B.'s cattle, sheep, horses, wood or furniture with his own, erroneously supposing that they belong to him. *Ryder* v. *Hathaway*, 21 Pick. 298, 305; Story on Bailments sec. 40. To hold otherwise would be clearly unjust, and is not sanctioned by the authorities. The true rule seems to be this, that if one man so confounds the goods of another with his own, that they cannot be distinguished, he must himself bear all the inconveniences of the confusion, and it is for him to distinguish his own property or lose it. This doctrine was applied to the case of a trustee having charge of the property of another. *Hart* v. *Ten Eyck*, 2 Johns. Ch. 107.

So also, is *Lapton* v. *White*, 15 Ves. 432; and this doctrine is recognized by Judge Story in his work on Bailments, sec. 40; and so is 2 Kent's Com. sec. 365. In *Pratt* v. *Bryant & al.*, 20 Vt. 333, it was held that a person who had intermingled his wood with that of another did not lose it thereby, although it could not be distinguished, and the intermingling was intentional, the person having erroneously supposed the other had bargained for it.

If the mixing is wilful and without the consent of the other, and the articles are of such a nature that they cannot be distinguished and separated, the civil law gives the whole to the one not consenting to the

mixture, but allows a satisfaction to the other; but the common law, as it is laid down, gives the whole to the one not consenting, but without compensation to the other. Story on Bailments, sec. 40; 2 Kent's Com. sec. 364; and so it is distinctly held in *Willard* v. *Rice*, 11 Met. 493; *Beach* v. *Schmuttz*, 20 Ill. 185; 19 U. S. Dig. 127, sec. 2. This, however, is to be carried no further than necessity requires, and it seems to be understood by these same writers, that if the articles so mingled are of the same kind and of equal value, the injured party may take his given quantity, and not the whole. In many cases this would clearly be just, but however the law may be on this point, we think it quite clear, on the authorities, that a party does not lose his property in goods by a careless and negligent intermixture of them with the goods of another, if they can still be distinguished and separated.

It is clear, of course, that, by mingling these horses, even if done negligently, the debtor acquired no title to the plaintiff's horse, and the creditor had no right to attach him for A. W. Moore's debt. Indeed, the law which affects the title in case of the confusion of goods, does not apply to cattle and horses, and things of a similar kind, that may readily be identified. It is so distinctly determined in respect to cattle, in *Holbrook* v. *Hyde*, 1 Vt. 286; and it is quite obvious, we think, that it must be so, for the very foundation of the rule is here wanting, and that is, the confusion of the goods, or the inability to identify them. See *Treat* v. *Barber*, 7 Conn. 274.

The right of a sheriff having a writ against one of the persons whose goods are together, but distinguishable, grows out of the necessity of the case. He has no right to attach the other's goods, but *is bound* to attach the debtor's. If he is unable to distinguish them, he may detain the whole reasonably, for the purpose of making inquiry; but his right in this direction extends no farther than the necessity of the case demands. If, on reasonable inquiry, he will be enabled to distinguish the goods, he is bound to make it, and could not otherwise justify the detention of another's goods. If the other owner, on request by the officer to point out his goods, refuse to do it, the officer might then take them and detain them until distinguished and demanded. Such is the doctrine, of *Albee* v. *Webster*, 16 N. H. 362.

The mere fact that a party has been negligent or careless in allowing the goods to be mixed, would not exonerate the officer from the duty of making inquiry. If the party, by his acts or words, wilfully affirmed the property to be the debtor's, and so misled the sheriff, he might be estopped to claim the goods afterwards; but the mere negligence of the plaintiff in allowing the horses to be placed in adjoining stalls, could confer no right on the officer to attach and hold the plaintiff's horse for A. W. Moore's debt, or to do anything more than to detain it for reasonable inquiry.

If, then, he took the plaintiff's horse, not to detain it to make inquiry, but because he understood he was directed to attach it, and he did so, intending to hold it at all events, he did it at his peril, and would be liable to plaintiff in trespass; and there was evidence tending to prove that he so intended to hold it, there being testimony that plaintiff's coun-

sel explained to the defendant the plaintiff's title, and requested him to give up the horse, but that the defendant declined to do so, saying he was ordered to make the attachment, was indemnified, and should make no shift.

In the case of *Gilman & al.* v. *Hill*, 36 N. H. 311, which was trover for a lot of sheep's pelts, attached on a writ against one Sanborn, it appeared that part of them belonged to the plaintiffs, and the rest had been mingled with the plaintiffs' without their knowledge, by the debtor. Upon the attachment, defendant was notified that the pelts belonged to plaintiffs, but he removed them without inquiry as to the plaintiffs' rights, and after the suit was brought sold them; the court held this was evidence of conversion; and it must have been upon the ground that defendant took them intending to attach and hold them, and not for the purpose of inquiry.

Where a debtor drove his sheep to plaintiff's pasture, and mixed them with plaintiff's without his consent, and the sheriff took the whole, the court held that he was liable in trespass to the plaintiff. *Kingsbury* v. *Pond*, 3 N. H. 513. The court say that if the sheriff had requested the plaintiff to point out his sheep, and he had refused to do so, it might have altered the case. We think, however, that the result would have been the same if the plaintiff had consented to take the debtor's sheep to pasture, but without any purpose to conceal them from the officer.

When corn of the plaintiff's was intermixed with that of the debtor, without the consent of either, it was decided that an officer might take and hold the whole until the plaintiff identified his corn and demanded a delivery. *Lewis* v. *Whittemore*, 5 N. H. 366. In that case the intermixture must be regarded as accidental, and as the corn could not be distinguished, the owners would be tenants in common of their several shares; Story on Bail. sec. 40; and a sheriff might take and sell the debtor's interest.

In *Walcott* v. *Keith*, 22 N. H. 211, it is said that to justify an attachment of the goods of another, on the ground of their being mixed with those of the debtor, defendant must show that they were intermixed in such manner that he could not, upon due inquiry, distinguish them from the others; and so is *Wilson* v. *Lane*, 33 N. H. 476, holding, per *Bell*, *J.*, that it is the duty of the officer to make reasonable inquiry to ascertain what goods are liable to be attached; but that it was enough if he applied to plaintiff to point out his goods, and he refused to do it.

The case of *Robinson* v. *Holt*, 39 N. H. 557, goes upon the ground that the hay sued for was so intermixed with that of the debtor, that it could not be distinguished, and that it was intermixed by the fault or negligence of the debtor, of such character, that, as between the plaintiff and the officer, it all became the property of the debtor. If the facts are all reported, such a conclusion might be questionable, perhaps, but however this may be, the case differs widely from the one before us, because here the property was easily distinguished.

*Taylor* v. *Jones*, 42 N. H. 25, was trespass, and it was held that as the goods were mixed with those of the debtor, being marked as the

debtor's without objection by the plaintiff, and in consequence of plaintiff's absence the goods could not be distinguished, the defendant was justified in taking the whole in the first instance, and trespass could not be maintained for the taking, unless by subsequent acts defendant became a trespasser *ab initio.*

In *Shumway* v. *Rutter,* 8 Pick. 443, which was trover for some furniture attached by the defendant as the property of J. S., it appeared that plaintiff's furniture was mixed with the debtor's, and in his possession, and so mixed that neither the plaintiff nor the debtor could distinguish it; that at the time of the attachment, J. S. told the officer it was all his, but soon after the plaintiff claimed a part of it, and defendant desired him to select what he claimed, but the plaintiff, although he produced the bill of sale of what he claimed, and showed it to the defendant, said he could not select the articles, neither could the debtor select them. The officer, therefore, retained and sold the whole.

The court decided that defendant was not a trespasser for taking the plaintiff's goods which he had allowed to be so intermixed, but that the sale of the whole was a conversion, upon the ground that he ought to have selected from the whole quantity enough to correspond with the bill of sale, and might, if he chose, retain the most valuable. The court also says that if the owner of a part can distinguish and point out what belongs to him, the officer would be a trespasser if he should take it.

In that case, the goods were so intermixed they could not be distinguished, and it is therefore clear that the officer would not be a trespasser for taking possession of the whole. In principle, the case is much like that of *Lewis* v. *Whittemore,* where plaintiff and the debtor were tenants in common of the whole mass.

The case of *Ryder* v. *Hathaway,* 21 Pick. 306, was trespass for wood, and the court held that if the plaintiff mixed wood from his own lot with wood from the defendant's lot adjoining, supposing it all to be his, and the defendant, knowing that part of it was the plaintiff's, took the whole, he would be a trespasser. This would certainly be so, if defendant knew what part belonged to plaintiff, and could distinguish it; otherwise, if so intermixed that it could not be separated, they would, in such case, be tenants in common.

*Smith* v. *Sanborn,* 6 Gray 134, is a case where a debtor sold his stock of furniture to the plaintiff for $2000, and the plaintiff took possession of the store and furniture, and commenced retailing it, making new purchases from time to time, to the amount of $200, which was added to the original stock. The defendant attached and sold the whole as the debtor's property. The court decided that the defendant had no right to attach the whole stock in plaintiff's possession, without first endeavoring, by the exercise of a proper degree of caution and diligence, to ascertain whether any, and if any, what part of it, was honestly owned by the plaintiff, and that it did not necessarily devolve upon the plaintiff, and without request, to give information about the state of the title; that it was no more than a reasonable precaution on the part of the

officer to make some inquiry of the plaintiff in relation to the stock, before the service of the writ.

In *Treat* v. *Barber & al.*, 7 Conn. 274, it was held that the confusion of goods is the mixture of substances that make one undistinguishable mass, such as liquids, corn, hay, &c., citing Wood's Just. 158, and 2 Blk. Com. 404. But that placing crockery, china or other articles resembling each other on the same shelf, is not a confusion of them, within the meaning of the law.

The defendant introduced evidence tending to show that plaintiff had intermingled her goods with her father's goods, so that she alone could distinguish them, and that, wishing to attach the father's goods, he requested her to select such as belonged to her, but she refused to do it, claiming the whole as her own, part of them by *bona fide* purchase of her father. The court held that, as she claimed the whole, her refusal to select was no violation of her duty, and the defendant took them at his peril; and the court held that there was no error in refusing to instruct the jury that if she refused so to select, the defendants were not trespassers for taking the whole; but the court held that if the plaintiff had fraudulently intermingled the goods so as to be inseparable by the officer, to prevent an attachment of those that were her father's, the officer might justify taking the whole.

From this review of the cases, it is quite apparent that there is some confusion in the authorities upon the subject of confusion of goods; and so far as the rights of an officer about to make an attachment is concerned, it arises from not properly discriminating between those things which *can*, and those which *cannot*, be distinguished, when mingled together.

As to those which can be distinguished, the doctrine of confusion of goods does not apply, and although they may be wrongfully mingled by one owner, without the consent of the other, the title of neither is affected; and consequently the goods of one cannot be taken for the debts of the other. If, however, they are fraudulently intermingled to mislead and embarrass the officer, and prevent an attachment, he would be justified in taking and holding the whole for the purpose of selecting those of the debtor. As if in a case like that of *Kingsbury* v. *Pond*, 3 N. H. 513, the plaintiff had consented to the mixing of the debtor's sheep with his, so as to conceal them from the officer.

To justify the attachment of the goods of another where they are intermingled without any fraudulent design, and they are distinguishable, the officer must show that they were mixed in such manner that upon due inquiry he could not distinguish those of the debtor from the others. *Walcott* v. *Keith*, 22 N. H. 211; *Wilson* v. *Lane*, 33 N. H. 476; *Smith* v. *Sanborn*, 6 Gray 134; *Treat* v. *Barber & al.*, 7 Conn. 274; *Kingsbury* v. *Pond*, 3 N. H. 511.

The language of some of the cases would seem to imply that, if the goods were so intermingled that the officer could not select those of the debtor, he might, without notice to the other party, attach and hold the whole, until those of the other party were designated and claimed by him. Upon such views the officer might have taken all the horses in

the stable when he found these, and held them until identified by their owners.

Such a doctrine, we think, cannot be supported. It is not necessary to enable the sheriff properly to execute his precept. If, as in this case, he wishes to attach two out of many horses in the same stable, he is bound to make reasonable efforts and inquiries, in order to ascertain what horses belong to the debtor. If the various owners, and the debtor, are at hand, he would ordinarily inquire of them, although to guard against interference he might, while making such inquiries, detain in the stable such horses as he had reason to suppose might prove to be those he sought. This power, we think, is all that is necessary, and is the view that best accords with the adjudged cases. Nor do we think that the rule is otherwise where the goods are carelessly or negligently intermingled, but without fraud.

In the case of goods that cannot be distinguished, the fault of one party who causes the intermixture may affect the rights of both; but in a case like this, it could not relieve the officer from the duty of making reasonable inquiry to ascertain what goods belong to the person other than the debtor, for such fault does not affect the title; *Bryant* v. *Weare*, 30 Me. 299; *Gilman & al.* v. *Hill*, 36 N. H. 323; 2 Kent's Com. 364; and unless it was intended to mislead the officer, in which case it would be a fraud, it cannot relieve him of the duty to make reasonable inquiries.

What would be reasonable inquiry, must depend upon the circumstances of the particular case, and cannot be fixed by any positive rule; *Wilson* v. *Lane*, 33 N. H. 476; and it is urged by defendant that among the considerations that ought to bear on the question of reasonable inquiry would be the plaintiff's own negligence, and that there was error in not submitting that to the jury.

There is, however, no objection to the instructions as to reasonable inquiry by the defendant; but the question of negligence in the plaintiff, not submitted to the jury, and for which exception is taken, was, as we understand it, whether, by the plaintiff's fault in mixing the horses, the defendant was not authorized to attach the two he did take, as he would be, had there been fraud. Besides, from the case as reported, we are at a loss to perceive any evidence tending to prove negligence on the part of the plaintiff in allowing these horses to be placed in adjoining stalls.

As already suggested, we are of the opinion that if the defendant attached the plaintiff's horse with the purpose of holding him at all events, and not temporarily, to make inquiries, he is liable in trespass, and that the instructions on that point are correct.

Under the circumstances, it is clear that if there was no fraud in the plaintiff, the defendant had no right to attach the horse and hold him for A. W. Moore's debt. At the most, he had only the right to detain him a reasonable time for inquiry, and if he took him for the other purpose he is a trespasser.

It is proper to say that we have been led into this extended examination of authorities, by the able and searching arguments at the bar.

As to exemplary damages, the instructions were, that the jury might give such, if they found that the defendant rashly and heedlessly took the plaintiff's horse without taking due care to learn what the plaintiff's rights were.

Where the act complained of is malicious or wanton, or is characterized by gross negligence in the defendant, exemplary damages may be awarded, according to the decisions in this State; but we are not aware that they have gone so far as the rule in this case. In *Whipple* v. *Walpole*, 10 N. H. 130, the rule laid down was, that exemplary damages might be awarded where there was gross negligence; and the rule laid down by Mr. Sedgwick, in his valuable work on Damages, p. 39, is, that exemplary damages may be awarded whenever the elements of fraud, malice, gross negligence and oppression mingle in the controversy. This rule, however, is questioned in 2 Greenl. Ev. sec. 253, and note, where the authorities are extensively reviewed.

Upon the whole, we are not disposed to extend the rule which allows exemplary damages to cases where the injurious acts are merely rash and heedless.

There must, therefore, be judgment on the verdict for $115, the exemplary damages being excluded, on the plaintiff's remitting the $25 for exemplary damages.