[No. 35070. Department Two. September 29, 1960]

HELEN HILYARD MILLS, *as Executrix, Appellant,* v. ORCAS
POWER & LIGHT COMPANY *et al., Respondents.*[1]

[1]Reported in 355 P. (2d) 781.

*Graves, Kizer & Gaiser* and *Warren W. Russell,* for appellant.

*Abrams, McCush & Rinker* and *Walsh & Margolis,* for respondent Orcas Power & Light Company.

*Elmon A. Geneste* and *Livesey, Kingsbury & Livesey,* for respondent, Inter Island Telephone Company, Inc.

Foster, J.—Appellant, plaintiff below, appeals from a judgment of dismissal following the sustaining of a demurrer to her second amended complaint in an action for wrongful death. Appellant, the executrix of the estate of William George Mills, deceased, sued the Orcas Power and Light Company and the Inter Island Telephone Company for the death of Mills whose plane became entangled in power and telephone lines adjacent to the Orcas island airport. The airport is jointly maintained by San Juan county and the owner of the land. The county and the land owner were not joined as defendants.

The allegations of the second amended complaint may be summarized as follows:

At midday in May, 1956, William George Mills and one other were occupants in a small airplane which was approaching the Orcas island airport for a landing from the south end of the air strip.

The angle of the approach was normal and customary. The landing gear caught in the wires of the respondents' power and telephone lines along the highway immediately adjoining the air strip. The plane turned upside down and crashed, killing both occupants.

The airport, the only one on Orcas island, was constructed and maintained jointly by San Juan county and the owner of the land, and is open and available to the general flying public in interstate and intrastate flights, commercial and private, indiscriminately. Both respondents, Orcas Power and Light Company and Inter Island Telephone Company, under county franchises, maintained the poles and lines along the public highway. The telephone franchise was conditioned upon the company's conformity with any subsequent requirements by the county commissioners for public protection and safety. The power company's franchise required that the line of poles ". . . shall be located . . . in such manner as to cause the least inconvenience possible to the public . . ." Both lines were erected before the airport was constructed.

The air strip extends north and south; the south end is approximately one hundred feet from the north shoulder of the public highway. Respondents' lines are strung along the road which runs east and west. The lines and poles of the power company were on the south side of the road and approximately thirty feet high; the telephone lines and poles were about twenty feet in height and on the north side of the road. Respondents' alleged negligence is that neither the poles nor the wires had been painted or marked in any manner, and, by the weather process of many years, had faded into a neutral color. They were invisible, or, at least, were difficult to observe from a plane approaching from the south. As a result of the absence of clear markings

on the lines to warn approaching aircraft, the Mills' plane, although in a proper course of descent, collided with the lines and crashed.

The respondents' demurrer admits the truth of the allegations in the complaint. The trial court's decision that the complaint failed to state facts constituting a cause of action[2] can be based only upon the hypothesis that the respondents owed no duty to mark their lines and poles for the protection of planes using the airport. The complaint alleged that respondents knew the conditions of the lines endangered planes approaching the field from the south and that respondents failed in their duty to mark the lines. This, however, does not confront the issue, which is: Did the respondents, after receiving notice of the hazard, have a duty to correct it? Clearly, if such a duty existed, the complaint alleged a breach thereof and such was the proximate cause of the disaster. A cause of action was then stated. On the other hand, absent that duty, the complaint failed to state facts sufficient to constitute a cause of action, and the demurrer was properly sustained.

Whether there was a duty owing from the respondents to the plane's occupants is a question of law to be decided by the court. In that decision, the allegation, that it was the custom and practice of utility companies to lower or remove their lines or adequately to mark them, may be disregarded as surplusage. The existence or nonexistence of such a custom is not a pleading consideration, but, on the other hand, is a question of admissibility of evidence and the weighing thereof as to whether or not

[2]Effective January 1, 1960, demurrers were abolished by Rule of Pleading, Practice and Procedure 7(c). There is no further requirement that the complaint allege facts constituting a cause of action. The rules respecting the sufficiency of a complaint were stated by the United States supreme court in *Conley v. Gibson*, 355 U. S. 41, 47, 2 L. Ed. (2d) 80, 78 S. Ct. 99:

" . . . The decisive answer to this is that the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. . . ."

a defendant has conformed his conduct to the standard of care required by the substantive law. 2 Wigmore on Evidence (3d ed.) 488, § 461.

That the primary duty of marking the poles and lines to caution landing aircraft was upon the owners and operators of the airport itself, there can be little doubt. A public airfield extends an implied invitation to aircraft, and the duty owed, therefore, is one of reasonable care to see that the premises are safe. *Beck v. Wings Field, Inc.,* 35 F. Supp. 953, reversed on other grounds, 122 F. (2d) 114; *Ross v. Air Farms, Inc.,* 13 Misc. (2d) 250, 175 N. Y. S. (2d) 319; *Grossman & Sun v. The King,* 1 (1952) Can. L. Rep. 571, 2 (1952) Dominion L. Rep. 241, reversing 1 (1951) Dominion L. Rep. 168. The law thus places upon proprietors of airfields the obligation to see that the airport is safe for such aircraft as are entitled to use it, and to give proper warning of any danger of which they knew or should have known. *Peavey v. Miami,* 146 Fla. 629, 1 So. (2d) 614, 1941 U. S. Av. Rep. 28; *Imperial Airways v. National Flying Services,* 1933 U. S. Av. Rep. 50; *Grossman & Sun v. The King, supra.*

The rule was well stated in *Peavey v. Miami, supra,* as follows:

". . . the city [which operated the airport] . . . was required to exercise the same degree of care in the maintenance of its property as is imposed upon others who undertake to render services or furnish accommodations to the public. That is, 'the law imposes a duty to use proper care, precaution, and diligence in providing and maintaining the accommodations in a reasonably safe condition for the purposes to which they are adapted, and are apparently designed to be used. If the accommodations for any reason are not reasonably suitable and safe for the purposes for which they may ordinarily and apparently be used in a customary way, the public should be excluded from their use, or appropriate notice of their unsuitable or unsafe condition should be so given as to warn persons of dangers in using them. A failure to perform these duties or any of them may be negligence that, if it proximately results in injury to another without his fault, will constitute a cause of action for compensatory damages. See Woodbury v.

·Tampa Waterworks Co., 57 Fla. 249, 49 South. 556, 21 L. R. A. (N.S.) 1034.' Turlington v. Tampa Elec. Co., 62 Fla. 398, 56 So. 696, 698. Therefore, it was the duty of the defendant to see that the airport was safe for aircraft and to give proper warning of any danger of which it knew or ought to have known; and the defendant had the 'duty to keep the runways free from obstructions, so far as possible, or to place markers warning pilots of danger.' 6 Am. Jr. 11, Aviation, Sec. 14."

Accord: *Hesketh v. Liverpool Corp.,* 4 (1940) All Eng. Rep. 429; *Plewes v. Lancaster,* 171 Pa. Super. Ct. 312, 90 A. (2d) 279; *Beck v. Wings Field, supra; Ross v. Air Farms, supra; Read v. New York City Airport,* 145 Misc. 294, 259 N. Y. S. 245; *Miller v. Contra Costa County,* 106 Cal. App. (2d) 304, 235 P. (2d) 76; *Behnke v. City of Moberly* (Mo. App.), 243 S.W. (2d) 549, C.C.H. 3 Av. Cas. 17,740, 1951 U. S. Av. 509; Shawcross and Beaumont on Air Law (2d ed.), 523, § 580; Fixel on the Law of Aviation (3d ed.), 202, § 200; 6 Am. Jur. 19, § 28.

The airport proprietor's duty to maintain safe conditions for craft using the field extends not only to the runway itself, but to the take-off and landing flight ways. These are as much a part of the airport, and thus as much a part of the proprietor's responsibility, as the runway itself.[3] It is the airport operator's duty to warn landing or departing planes as to any structures, man-made or natural, which obstruct the proper general take-off or landing flight way. *Hesketh v. Liverpool Corp., supra;* Shawcross and Beaumont on Air Law, *supra.*

RCW 14.08.030 (3) recognizes that duty, and provides a means whereby the airport operator may comply therewith when the obstruction exists outside the physical boundaries of the airport on property owned by another. The pertinent provision is:

---

[3]In another context, this court stated: ". . . Clearly, an adequate approach way is as necessary a part of an airport as is the ground on which the airstrip, itself, is constructed . . . The taking of an approach way is thus reasonably necessary to the maintenance and operation of the airstrip. .· . ." *Ackerman v. Port of Seattle,* 55 Wn. (2d) 400, 348 P. (2d) 664.

"Where necessary, in order to provide unobstructed air space for the landing and taking off of aircraft utilizing airports . . . acquired or operated under the provisions of this chapter, every municipality is authorized to acquire . . . easements through or other interests in air spaces over land or water, interests in airport hazards outside the boundaries of the airports . . . and such other airport protection privileges as are necessary to insure safe approaches to the landing areas of said airports . . . and the safe and efficient operation thereof. *It is also hereby authorized to acquire . . . the right or easement, for a term of years or perpetually, to place or maintain suitable marks for the daytime marking and suitable lights for the nighttime marking of airport hazards*, including the right of ingress and egress to or from such airport hazards, for the purpose of maintaining and repairing such lights and marks. . . ." (Italics ours.)

For the purposes of the statute, "Municipality" is defined in RCW 14.08.010(2) as meaning:

". . . any *county*, city, town or port district of this state . . ." (Italics ours.)

"Airport hazard," as defined by RCW 14.08.010(1) by reference to RCW 14.04.020(14), means:

". . . any structure, object of natural growth, or use of land, which obstructs the airspace required for the flight of aircraft in landing or taking off at an airport or is otherwise hazardous to such landing or taking off."

Accepting, as we do, appellant's allegations at face value, respondents' poles and lines constituted an "airport hazard."

The airport zoning laws also recognize the duty of airports to prevent the erection of airport hazards subsequent to the establishment of the ports, and to eliminate or minimize the danger from previously existing hazards. RCW 14.12.020 specifically provides, *inter alia*:

"It is hereby found that an airport hazard endangers the lives and property of users of the airport and of occupants of land in its vicinity, and also, if of the obstruction type, in effect reduces the size of the area available for the landing, taking-off and maneuvering of aircraft . . . Accordingly, it is hereby declared: . . . (2) that it is therefore necessary in the interest of the public health, public safety, and general welfare that the creation or establishment of

airport hazards be prevented; and (3) that this should be accomplished, to the extent legally possible, by exercise of the police power, without compensation. It is further declared that both the prevention of the creation or establishment of airport hazards and the elimination, removal, alteration, mitigation, or *marking and lighting of existing airport hazards are public purposes for which political subdivisions may raise and expend public funds and acquire land or property interests therein.*" (Italics ours.)

RCW 14.12.030 sanctions zoning regulations by municipally maintained airports to prevent and eliminate subsequently created hazards. Although RCW 14.12.090 (2) limits the zoning power as respects already existing hazards, the statutes specifically provide for the marking and lighting of existing hazards by the municipality.

". . . No airport zoning regulations . . . shall require the removal, lowering, or other change or alteration of any structure or tree not conforming to the regulations when adopted or amended, or otherwise interfere with the continuance of any nonconforming use, except as provided in RCW 14.12.110(3)." RCW 14.12.090(2).

"In granting any permit or variance under this section, the administrative agency or board of adjustment may . . . so condition such permit or variance as to require the owner of the structure or tree in question to permit *the political subdivision, at its own expense, to install, operate, and maintain thereon such markers and lights as may be necessary to indicate to flyers the presence of an airport hazard.*" RCW 14.12.110(3). (Italics ours.)

The structures, which eventually became an obstruction in the landing approach, were lawfully erected prior to the construction of the airport, and were thereafter a potential airport hazard through no act of the franchise holders, but rather through the acts of those constructing and operating the airport. The airport operators had the power to place warning markers on the poles and lines. When existing structures become hazards upon the establishment of an airport, the primary duty of elimination is upon airport proprietors if possessed of the power of correction. Furthermore, knowledge of the landing approach requirements, of what constitutes a dangerous situation, and of what must

be done to insure safety, must be imputed to the airport operators. For this reason also, the primary duty to provide for the marking of obstructions devolves upon them.[4] The legal duty to provide safe premises for airplane use, which includes landing and take-off, similarly places upon the airport operator the primary obligation to warn of obstructions.

The Orcas island airport had a primary and nondelegable duty to appellant's decedent to warn him of any obstructions in the landing approach way. Does it follow, however, that respondents thereby owed no duty to those in the class of appellant's decedent?

■■ Respondents vigorously contend that the airplane, flying at a low altitude, was a trespasser upon their property, and that, therefore, no duty to render the property safe for the airplane was owed by respondents. It must be recognized, however, that a franchise holder has a property interest only in that which is explicitly granted. *Continental Ill. Nat. Bank & Trust Co. v. Middlesboro*, 109 F. (2d) 960; *Magnolia Petroleum Co. v. Dudney*, 211 Ark. 469, 200 S. W. (2d) 793. Nothing passes by implication in the grant of a public franchise. *Mississippi Power Co. v. Aberdeen*, 95 F. (2d) 990. Since respondents have mere rights of use, rather than proprietary interests in land itself, their property interests extend solely to the actual use made. Unlike landowners, they have no interest in the airspace immediately above their property; their property interests end at the top of their poles and lines. Respondents cannot be heard to complain of an alleged trespass in the airspace near to or above the poles and lines because such would not constitute an allegation of an invasion of respondents' interests. See *Yoffee v. Pennsylvania Power & Light Co.*, 385 Pa. 520, 123 A. (2d) 636.

■ Can respondents, in contending that they owed no duty and thus could not have been negligent, argue that the actual collision with the poles and lines constituted a

---

[4]See Summary Report of the President's Airport Commission, 19 Jour. Air L. & Commerce 221.

trespass upon respondents' property? The answer is no, because the order of discourse proceeds in the opposite direction. The issue of whether the actual contact was a trespass or not cannot be resolved until the issue of negligence is decided. It is familiar law that, where a defendant mistakenly invades the plaintiff's property, and defendant's mistake was induced by plaintiff's own negligent conduct, defendant will not be liable for trespass if he has not acted unreasonably. *Moore v. Bowman,* 47 N. H. 494; *Parker v. Walrod* (1836, N. Y.), 16 Wend. 514, 30 Am. Dec. 124; *Roche v. Milwaukee Gas Light Co.,* 5 Wis. 55; *Tousley v. Board of Education,* 39 Minn. 419, 40 N. W. 509; Prosser on Torts (2d ed.) 80, 82, § 17; 87 C. J. S. 994, § 38. Thus, if respondents negligently caused the airplane to come into contact with the wires, then there was no trespass upon the wires. If respondents were not negligent, then there was a trespass. We are returned, therefore, to the original question of whether respondents owed to approaching aircraft the duty to warn of hazards maintained by them; the question of whether there was a trespass by contact with the lines becomes immaterial to our decision.

The airport failed in its primary duty. Was there a secondary duty upon the respondents, so that, when it became clear that the airport had failed in its duty, there devolved upon respondents an obligation to warn landing aircraft of the obstructions? The answer is in the affirmative.

█ The criterion for imposing a duty of care has been stated as follows:

"... the duty to use care is predicated upon knowledge of danger, and the care which must be used in any particular situation is in proportion to the actor's knowledge, actual or imputed, of the danger to another in the act to be performed [or in the failure to perform an act]. . . ." *Leek v. Tacoma Baseball Club,* 38 Wn. (2d) 362, 229 P. (2d) 329.

See, also, *Burr v. Clark,* 30 Wn. (2d) 149, 190 P. (2d) 769; 2 Harper & James, The Law of Torts, 1018, 1019, § 18.2; 65 C. J. S. 332, 339, § 4(b). In other words, it is the foreseeability of some type of relationship or contact between

the person or property of one with the person or property of another, and the probability of danger arising therefrom, upon which the imposition of a duty from one to the other is based. See *Squires v. McLaughlin*, 44 Wn. (2d) 43, 265 P. (2d) 265; 2 Harper & James, *supra*.

■ The application of this criterion results in the imposition upon respondents of a secondary duty of warning as to the hazards they maintained.

■ Knowledge by respondents of danger to landing aircraft resulting from the condition of the lines was alleged. From the time immediately after the construction of the airport to such time as respondents acquired knowledge, actual or constructive, of the danger created by the poles and lines, they were entitled to assume that, if the lines did constitute a hazard, the airport would have performed its duty, and that, since the airport did not make any attempt to place warning markers, the lines were not dangerous. However, once respondents acquired knowledge of the dangerous condition, it devolved upon them to inquire of the airport operator whether he intended to install warning devices, and to request him to do so. If the airport operator refused respondents' requests, then respondents had the duty to place the markers for the safety of incoming aircraft, and could recover their expenses from the airport.[5] If the operator agreed, then respondents would be relieved of any obligation until a reasonable time had passed. If the markers were not then placed, respondents again acquired a duty to request action from the operator, or could themselves place the markers and recover any expenses thereby incurred from the airport.

■ The imposition of such duties accords with the foreseeability criterion of requiring a duty of care. It is also in conformity with the well-settled common-law principle that one must exercise reasonable care to maintain his property so as not to injure those using the adjacent

[5] Regarding who should bear the expense, see RCW 14.12.020, RCW 14.08.030(3), and RCW 14.12.110(3). See, also, *Postal Telegraph-Cable Co. v. Pennsylvania Public Utility Comm.*, 154 Pa. Super. Ct. 340, 35 A. (2d) 535.

highway. *Latzoni v. City of Garfield,* 22 N. J. 84, 123 A. (2d) 531; *Sinclair Texas Pipe Line Co. v. Ross,* 175 Okla. 435, 54 P. (2d) 204; *White v. Suncook Mills,* 91 N. H. 92, 13 A. (2d) 729; Prosser on Torts (2d ed.), 427, 428, § 75; 65 C. J. S. 573, § 77.

 The common law owes its glory to its ability to cope with new situations. Its principles are not mere printed fiats, but are living tools to be used in solving emergent problems. Such is manifest here where an accepted principle of the law is analogous, and its application results in fairness to the persons concerned. Thus, an occupier of property, who maintains a part thereof that he knows or should know that others will reasonably believe it to be part of a highway, is subject to liability for harm caused while they are using such part as a highway if he fails to exercise reasonable care for their protection. *Holmes v. Drew,* 151 Mass. 578, 25 N. E. 22; *Crogan v. Schiele,* 53 Conn. 186, 1 Atl. 899, 5 Atl. 673; *Southern v. Cowan Stone Co.,* 188 Tenn. 576, 221 S. W. (2d) 809; *Barlow v. Los Angeles County Flood Control Dist.,* 96 Cal. App. (2d) 979, 216 P. (2d) 903; *White v. Suncook Mills, supra;* 2 Harper & James, The Law of Torts, 1445, § 27.4; Prosser on Torts (2d ed.), 427, 430, § 75; 65 C. J. S. 573, 574, § 77; 2 Restatement, Torts, 995, § 367.

 In our determination that the above rule of law is properly applicable, thus defining the duty of care owed by the owners of the lines to the aircraft, we must separately determine the legal status of planes flying in airspace near the lines, over private land generally. Are such planes where they properly can be? If so, then such rule applies.

In dealing with this problem, we must recognize that

"The invention of the airplane and the development of modern air transportation (with resulting changes in human relationships) have occurred somewhat subsequently to the development of the legal concepts emphasized in formulating early common law theories of liability. . . ." *Ackerman v. Port of Seattle,* 55 Wn. (2d) 400, 348 P. (2d) 664.

Further, in the *Ackerman* case we approved the statement of Judge Traynor in 1956 U. Ill. L. F. 232:

" ' . . . Courts have a creative job to do when they find that a rule has lost its touch with reality and should be abandoned or reformulated to meet new conditions . . . ' "

Thus, to apply the traditional restrictive legal categories of trespasser, licensee, and invitee to an airplane traveling in the space above a person's land is like trying to squeeze a square peg into a round hole. The ancient categories were designed to deal with entirely different situations and social conditions. Application of such rules to an airplane in flight is to use the letter of the law to kill its spirit. We have not previously done so, nor will we now. Such a use of legal categories would choke the growth of modern air transportation.

Congress, which has sovereignty over navigable airspace, has so recognized and has granted to airplanes the privilege lawfully to fly in that navigable airspace. By 49 U.S.C.A., § 1304, "There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit through the navigable airspace of the United States." What this means, in the light of *United States v. Causby*, 328 U. S. 256, 90 L. Ed. 1206, 66 S. Ct. 1062, and *Ackerman v. Port of Seattle, supra*, is that the ancient classifications of trespasser, licensee, invitee, are wholly inapplicable, and that airplanes are granted a privilege to fly within the navigable airspace. They may fly through this space without attaching to themselves the connotations consequent on application of the former categories, such as liability for technical trespass or a reduction in the duty of care owed to them. However, Congress cannot, nor has it purported to, completely immunize from liability operators of such aircraft or those responsible for the flight paths. Indeed, there certainly is liability for any harm caused the landowner, and such persons must respond for any damage to, interference with, or the taking or appropriation of the landowner's property. *United States v. Causby, supra; Ackerman v. Port of Seattle, supra; Hin-*

*man v. Pacific Air Transport,* 84 F. (2d) 755; *Antonik v. Chamberlain,* 81 Ohio App. 465, 78 N. E. (2d) 752; *Kuntz v. Werner Flying Service,* 257 Wis. 405, 43 N. W. (2d) 476; *Thrasher v. Atlanta,* 178 Ga. 514, 173 S. E. 817, 99 A. L. R. 158.

A plane flying in navigable airspace is privileged to be where it is. Its operator, or those responsible for its path of flight, has assumed responsibility for any consequent harm to the landowner, but that is wholly without reference to the ancient categories of trespasser, licensee, and invitee.[6] The foundation of liability is that where there has been an injury, there is a remedy.[7]

■ In the Federal aviation program act, Congress specifically declared that navigable airspace includes airspace above the minimum safe altitudes of flight prescribed by regulations issued under the chapter, and also "include airspace needed to insure safety in take-off and landing of aircraft." 49 U.S.C.A., § 1301 (24). An airplane flying within such limits is not a trespasser with respect

---

[6]See, 1 Harper & James, The Law of Torts, 45, § 1.15: "It appears that operators of aircraft are privileged to fly over the land of others for the purpose of travel at a reasonable height in compliance with all applicable statutes, ordinances and regulations; in other respects, in a manner such as will not interfere unreasonably with the possessor's use and enjoyment of his land. This principle has been adopted by the Restatement of Torts as a solution to the troublesome problem of the respective rights of the owner of the surface of land and the aviation industry. The principle recognizes the ownership of the air space by the owner of the surface of the land. It further recognizes his right to the complete and uninterrupted enjoyment of his land without unreasonable interference by those who wish to use the air space for legitimate travel. At the same time, it recognizes the interest of the aviation industry and of the public in the development of new forms of travel. . . . *Although the privilege of reasonable flight for the purpose of travel is recognized, the aviator is liable—regardless of his fault or negligence—for any harm caused to the owner of the surface* [where the fault of the surface owner has not caused the harm]." (Italics ours.)

[7]See, Shipman on Common Law Pleading (3d ed.), 54 ("There ought indeed to be a remedy for every wrong (ubi jus, ibi remedium) . . ."); 2 Holdsworth's History of English Law (4th ed.), 50; Wigmore, Responsibility for Tortious Acts: Its History, 7 Harvard L. Rev. 315, 383, 441; 2 Harper & James, The Law of Torts, 785, § 14.1.

to the property below, but is privileged to travel this modern highway.

A landowner must be compensated for any of his property that has been taken or appropriated and declared to be within the public domain of navigable airspace. The burden of *United States v. Causby, supra,* and *Ackerman v. Port of Seattle, supra,* is that the landowner has a right of action for compensation against the appropriate body or agency, but that does not purport to affect the status of flying aircraft. A plane is privileged to fly within navigable airspace without attaching to itself labels wholly inapplicable and unrealistic.

Consistent with such conclusions is *Cheskov v. Port of Seattle,* 55 Wn. (2d) 416, 348 P. (2d) 673, which specifically recognized that Congress had included in its definition of navigable airspace such " ' . . . airspace needed to insure safety in take-off and landing of aircraft' ", and held that there was no trespass upon a landowner's property where the planes were flying within navigable airspace. We there stated:

" . . . under the principles laid down in the *Causby* case, the flights were within the public domain; and the court erred in characterizing them as technical trespasses and awarding nominal damages."

We were guided by the following conclusion drawn from the *Causby* case:

" . . . the [United States supreme] court commented that if any airspace needed for landing or taking off were included within the navigable airspace, such flights would be immune, but even so, as the United States conceded, there would be a taking of private property for public use compensable under the fifth amendment to the constitution of the United States."

As we said in *United States v. Causby, supra,* and recently quoted with approval in *Cheskov v. Port of Seattle, supra:*

" . . . The air is a public highway, as Congress has declared. Were that not true, every transcontinental flight would subject the operator to countless trespass suits. Common sense revolts at the idea. . . ."

Common sense similarly revolts at the idea that, to avoid being a trespasser, an airplane must never land but remain in flight. To subject the operator to a lawsuit for every landing without damage, would make a mockery of the law.[8]

Thus, Congress has established highways through the air just as it has established water highways in navigable streams. The users of this new highway are entitled to the same care as are users of the conventional surface highways.

It is proper, therefore, to apply the analogous legal principle earlier described in defining the distinct relationship between the airplane and the owners of the power lines.

Appellant has substantially alleged that respondents knew or reasonably should have known that, because their lines and poles were weatherworn and without paint or markings, they were either invisible or quite difficult to observe from the air, and thus appeared to be part of the public highway (the air approach way). Mills, reasonably believing that respondents' property was part of the public highway, entered thereon and was killed in consequence. Respondents were fully aware that an airplane coming into contact with its wires was not merely in a dangerous situation, but in one almost surely calamitous. While it is impossible, in the exercise of even the highest degree of care, to render the situation of an airplane coming upon transmission lines less than catastrophic, the property holder's obligation in such circumstance results in a duty of reasonable care to indicate where the highway ends and the property begins. As was said in *Yoffee v. Pennsylvania Power & Light Co.*, *supra*:

" . . . the law does not allow anyone to install or maintain any instrumentality which to his knowledge may

[8]See *Lacroix v. The Queen*, 4 (1954) Dominion L. Rep. 470; *Brandes v. Mitterling*, 67 Ariz. 349, 196 P. (2d) 464; Rhyne, Airports and the Courts (1944), chapters V, VI, VII, and VIII; 17 U. Cinc. L. Rev. 327; 17 U. Cinc. L. Rev. 343; 20 U. Kan. City L. Rev. 138; 56 Mich. L. Rev. 1313; 19 Jour. Air L. & Commerce 253; 19 U. Pitt. L. Rev. 154; 56 Pub. Util. Fort. 536; 6 Am. Jur 6, § 6.

pull airplanes down from the sky and inflict serious injury or death on their occupants. . . ."[9]

Thus, although the primary, nondelegable duty to mark the obstructions was upon the airport proprietors, respondents did owe a duty, secondary in nature, reasonably to assure the safety of incoming aircraft vis-a-vis their lines and poles.

Appellant's complaint is sufficient. The judgment is reversed, and the case is remanded with instructions to overrule the demurrers.

FINLEY and ROSELLINI, JJ., concur.

HILL, J. (concurring specially)—I can concur with the result of the majority opinion, but solely on the ground that where one maintains an instrumentality that is potentially dangerous, and can reasonably anticipate harm to trespassers who are not aware of the dangers, there is a duty to give adequate warning. *Clark v. Longview Public Service Co.* (1927), 143 Wash. 319, 255 Pac. 380; *Talkington v. Washington Water Power Co.* (1917), 96 Wash. 386, 165 Pac. 87; 99 Wash. 695, 169 Pac. 596.

The complaint alleges that the defendant companies knew their power and telephone lines were in the path of the approach to the airfield, and that the lines and poles were, by reason of color and background, not visible to approaching planes. It alleges further that markers, which could have alerted the pilot of an approaching plane of the danger represented by the presence of the defendants' lines and poles, were available and standard. These devices, not having been installed by the airport proprietors who, the majority opinion points out, had the primary obligation to warn of hazards in the approach to their landing field, the defendant companies had what is referred to as a secondary duty: to warn incoming aircraft of the hazard represented by their lines. Whether the defendants were negligent in failing to perform that duty, and whether the occupants of the plane were contributorily negligent, were jury questions.

[9]See 24 Jour. Air L. & Commerce 362; 8 Hastings L. Jour. 230.

I cannot agree with what is said in the majority opinion regarding the "right" of the plane to be where it was and the absence of any trespass.

No one contends that Congress cannot control and regulate the use of the navigable airspace, but I do not concede that an act of the Congress can make all airspace " 'needed to insure safety in take-off and landing of aircraft,' " a public highway without regard to its present uses. *Ackerman v. Port of Seattle* (1960), 55 Wn. (2d) 400, 348 P. (2d) 664. Congress cannot appropriate, by fiat, the immediate reaches above the land (so much space above the ground as the owner can occupy or use in connection therewith) without compensation; nor can it, by fiat, appropriate the property rights of the defendants however they may be technically denominated. They were not owners of the fee in the land under their lines, but their poles stood in that land and their lines were lawfully placed in the immediate reaches above it. Whether it be called an easement, a franchise, or something else, they had a right not to have their poles and lines damaged or destroyed by someone trying to fly through them.

I do not question the rights of the owners of municipal airports to condemn such an obstruction; nor do I question the right of the owner of land to maintain an action for constitutional taking by reason of low flying planes. See *Ackerman v. Port of Seattle, supra.*

Here we are concerned with property rights which have not been condemned or taken—the lawful right to maintain power and telephone lines. It avails nothing to point out that defendants' property rights ended at the top of their poles and lines, when the action is brought because somebody was flying lower than the top of their poles and lines.

If the plane's collision with their lines be no trespass, for some technical reason which I am unable to grasp, it was clearly an invasion of their right to maintain their lines where they were. See *Kempf v. Spokane & Inland Empire R. Co.* (1914), 82 Wash. 263, 144 Pac. 77, L. R. A.

1915C 405; *Kedziora v. Washington Water Power Co.* (1937), 193 Wash. 51, 74 P. (2d) 898.

WEAVER, C. J., concurs with HILL, J.

---

December 15, 1960. Petition for rehearing denied.

[1]Reported in 355 P. (2d) 792.