CARLYLE E. PEAVEY v. CITY OF MIAMI; MAGIC CITY AIRWAYS, INC., v. CITY OF MIAMI.

1 So. (2nd) 614
En Banc
Opinion Filed April 15, 1941

630

*L. J. Cushman* and *Carson, Petteway & Stembler,* for Plaintiffs in Error;

*Lewis Twyman* and *Wm. W. Charles,* for Defendant in Error.

BROWN, C. J.—The declarations filed by the respective plaintiffs in these companion cases both charged the defendant, the City of Miami, with the same negligence, in substance that of carelessly maintaining and operating a municipal airport and that as a proximate result thereof the plaintiff Peavey sustained serious and permanent injuries and the airplane owned by the plaintiff Magic City Airways, Inc., was destroyed. The defendant city interposed pleas of the general issue and contributory negligence.

The plaintiff Peavey, one of the plaintiffs in error, who had had some years experience in the flying of airplanes, was operations manager and pilot for the Magic City Airways, Inc., and about the week prior to May 1, 1936, went to New York where a second-hand Fairchild six-passenger cabin plane was purchased for the corporation, the other plaintiff in error.

The Miami Municipal Airport at this time had two runways, each about 4,000 feet in length and 200 feet in width, one running from northwest to southeast and other running from northeast to southwest and each crossing about the center of the field. Outside the runways, the field was of firm sandy soil covered with grass, suitable for landing purposes. The Works Progress Administration, under the sponsorship of the City of Miami, had undertaken to rebuild and enlarge these runways, and in making these improvements employed a road-roller, tractor, grader and several dump trucks. During the pendency of this work, the field was kept open for planes to land upon, but that part under construction was marked off with flags in the daytime and red lanterns at night in accordance with the regulations promulgated by the Civil Aeronautics Authority and adopted by the City of Miami to govern the operation of the airport; furthermore, in conformity with these rules, this information was inserted in a weekly bulletin maintained by the Bureau of Air Commerce (for the purpose of giving such information to airmen) in the following form:

"Notice to Airmen No. 2-10, Dated April 16, 1936. (m-1) MIAMI, FLORIDA: Manager Municipal Airport advises NW-SE runway closed for reconstruction. Do not attempt to use. Danger area marked by staggering red flags in day time and red lanterns at night. Men working on field night and day. Flood lights not operating. Use caution when landing in grassed areas. See Second District Notice No. 2-9."

On April 30, 1936, the plaintiff Peavey, accompanied by another pilot left New York in the plane purchased by the corporation. They stopped first in Washington, then went to Wilmington where they spent the night, and proceeded on to Jacksonville the next day. Peavey did not have a license to fly at this time, having allowed his to lapse in 1934 for failure to put in the required flying hours, but he had secured a student's permit in order to make this flight. He said regulations prohibited him from taking off and landing the plane while the other pilot was an occupant, however; so the latter handled the controls until they reached Jacksonville at approximately three o'clock on the afternoon of May 1.

Peavey estimated he stayed at the Jacksonville airport about an hour before going on to Miami alone, and while there inquired of some airmen who had just flown in from Miami as to the condition of the latter field. They told him that the field was all right, but that the northwest-southeast runway was under repair and to keep off it. Plaintiff reported they stated that the center of the field, where the runways converge, was all right, and told him where to land. In addition, Peavey said he was already fairly well familiar with the conditions at the Miami airport, having been on the field just a week before. He did not read any official notice, however, nor did he request any information coming in over the radio from Miami as of that day, which could have been obtained free from the Federal Radio Station at the municipal airport in Jacksonville, giving full details as to the then existing conditions at Miami. He said that while talking to the weatherman at Jacksonville he looked at the bulletin board but did not remember seeing the Miami notice posted thereon although he would not say it was not there. He testified that he also made inquiry of the airport manager at Jacksonville as to the condition of

the Miami field, and was told in return that the northwest-southeast runway was under construction and "they said to keep off of that," which was the runway on which he later collided with the road-roller.

Although the time of the plaintiff's arrival in Miami was established to be between 6:45 and 7:15 p. m. on May 1, he himself reporting it to have been 7:12, there is much conflicting evidence as to the degree of light then existing. Some witnesses stated it was dark and dusky; others stated it was a clear day and that there was sufficient light to perceive objects a thousand or more feet away. The government meteorologist in charge of the Airway Station testified that sundown occurred at 6:52 p. m. on that day, that visibility was 15 miles or better, and that the twilight, with an illumination twenty times as great at the full moon at its zenith, continued for 24 minutes after sundown.

In improving the airport, the WPA employed three shifts, each working six hours; and at this time of day the second crew were leaving the field in order that the night shift could begin work. The operators of the road-roller and other equipment were moving to a point on the northwest-southeast runway so they could bring the machinery in for the night. There were no floodlights on the field, as the "Notice to Airmen" had stated, but red lanterns were staggered along the sides of that runway for its entire length, and there was a large red flag hoisted above the road-roller itself.

It was under these circumstances that the plaintiff Peavey approached the airport, circling from a point about 2,000 feet east of the field northward around the northeast corner probably 500 to 1,000 feet therefrom. He then skirted around west and southwest of the field and came in from the southwest going northeastward, parallel with the south-west-northeast runway (which was not under construction)

to make his landing. In making his partial circle, he testified that he "wasn't over the field" at any time; and further, it appears from his statements that he did not fly closer to the airport than 500 to 1,000 feet. He said he could not see any lights and that it was so dark the ground looked black to him; but, despite this, he did not turn on his landing lights though he said he knew there was a regulation requiring lights to be on after sundown.

According to plaintiff's testimony, he came in over the northeasterly direction with about 25 feet altitude, planning to land, not near the center of the field, but as near the south boundary as possible; that is, he intended to descend near the "early" or "leeward" side of the field, which is the general rule, and up the side so that he would not cross any runways, and stated he was in a position to do this. He said he could tell his altitude by sighting the road and red lights as he came in, though he could not see the ground ahead because the plane's motor blocked his vision for about a 90-degree sector. However, as he gilded in, in a straight line approach from a thousand feet away, he stated that he did not see any lights in the center of the field, and therefore supposed he was to roll through this space; so he changed his plan and decided to land nearer the center, which was later established to be about 100 to 150 feet from the runway under repair.

Other witnesses, who observed the landing, testified the pilot came in at a higher altitude, their estimates varying from 150 to 300 feet, and overshot his mark. In any event, the plaintiff landed near the center of the field, parallel with the northeast-southwest runway, rolled upon the runway under construction (going over a red light), and collided with the moving road-roller, which had no lights on it. The plaintiff testified that he did not see the machine at all, explaining that it was too dark to be seen from the air

even had he flown over the field (although he said he could see the runways as he turned north in making his circle), and that the airplane motor blocked his view directly ahead when he was on the ground. He said he could stop his plane within 500 feet of the point where it touched the ground, and within a shorter space if he applied the brakes but that he did not consider it necessary upon this occasion.

Plaintiffs contend the evidence shows the city was guilty of negligence in not sending out proper warnings (because the "Notice to Airmen" failed to mention the use of machinery in the work) ; in not having flood lights on the field; in not having the road-roller lighted; and in not having sufficient warning lanterns in the dangerous places on the field. The defendant insists that the City's negligence has not been established, and further, that the evidence given by the plaintiff himself shows he was contributorily negligent. The jury's verdict was in favor of the defendant in each case to which the plaintiffs below have brought this writ of error, complaining chiefly that the trial court did not correctly instruct the jury upon the issues and evidence to their harm and prejudice.

The first question presented for our consideration is to what extent, or in what capacity, is a municipality liable for torts that may be committed by it, or its agents, in the operation and maintenance of an airport. The weight of judicial authority seems to hold the operation of an airdrome by a municipality to be a "proprietary" function as distinguished from a "governmental" function. Pignet v. City of Santa Monica, 29 Cal. App. (2d) 286, 84 P. (2d) 166; Mollencop v. Salem, 139 Ore. 137, 8 P. (2d) 783, 83 A. L. R. 315, 350; Blue v. City of Union, 159 Ore. 5, 75 P. (2d) 977; Christopher v. City of El Paso (Texas), 98 S. W. (2d) 294. That is, this is true where the municipality does not devote the airport exclusively to municipal

or governmental purposes, but undertakes to conduct an enterprise of a commercial character from which it seeks to derive revenue. Mollencop v. Salem, *supra;* 6 Am. Jur. 15, Aviation, Sec. 21. While the record is silent as to the character of the use for which the airdrome was maintained, we shall assume that it was of a commercial nature, and therefore the municipality would be liable for any torts committed by it, or its agents, in respect thereto in the same manner and to the same extent that a private operator would be. Williams v. City of Jacksonville, 118 Fla. 671, 160 So. 15, 98 A. L. R. 513.

Consequently, the city, in the case at bar, was required to exercise the same degree of care in the maintenance of its property as is imposed upon others who undertake to render services or furnish accommodations to the public. That is, "the law imposes a duty to use proper care, precaution, and diligence in providing and maintaining the accommodations in a reasonably safe condition for the purposes to which they are adapted, and are apparently designed to be used. If the accommodations for any reason are not reasonably suitable and safe for the purposes for which they may ordinarily and apparently be used in a customary way, the public should be excluded from their use, or appropriate notice of their unsuitable or unsafe condition should be so given as to warn persons of dangers in using them. A failure to perform these duties or any of them may be negligence that, if it proximately results in injury to another without his fault, will constitute a cause of action for compensatory damages. See Woodbury v. Tampa Waterworks Co., 57 Fla. 249, 49 South. 556, 21 L. R. A. (N. S.) 1034." Turlington v. Tampa Elec. Co., 62 Fla. 398, 56 So. 696, 698. Therefore, it was the duty of the defendant to see that the airport was safe for aircraft and to give proper warning of any danger of which it knew

or ought to have known; and the defendant had the "duty to keep the runways free from obstructions, so far as possible, or to place markers warning pilots of danger." 6 Am. Jr. 11, Aviation, Sec. 14.

From our review of the record, we feel that the weight or preponderance of the evidence supports the jury's verdict and does not show that the defendant failed to exercise that degree of care required by the law in the operation of its airport. It was uncontradicted that there was sufficient area not under construction in which an airplane could have safely landed; that the area under construction was marked with red lanterns and flags; and that the city had caused to be placed in the pamphlet entitled "Notice to Airmen," maintained and distributed by the Bureau of Air Commerce (now Civil Aeronautics Authority) to all airports to be posted upon the bulletin boards, its warning that work was under way on the airport.

In our opinion, the "Notice to Airmen," while failing to mention that machinery was being used, was proper, and amply warned aviators that there was danger. It clearly and positively stated "NW-SE runway *closed* for reconstruction. *Do not attempt to use.*" (Emphasis ours.) Had the machinery not been upon the runway under construction, then there would be some basis for the plaintiffs' contention that one might not expect machinery, although it is hardly conceivable that work of this nature would be undertaken without using machinery in this area. But in view of the fact that it was being operated upon the runway at the time of the accident, which the "notice" emphatically warned airmen not to use for any purpose whatsoever, the contention cannot be sustained, for the construction was a hazard as much so as the machinery. The bulletin also gave full and definite notice that the "flood lights" [were]

not operating," so that defendant cannot be held lacking in this respect either.

Upon the question of whether or not there were sufficient red lanterns placed at the danger zone, there is some dispute, but again the weight of the evidence indicates that the defendant complied with the duty of properly marking the danger areas. One V. T. Sailing, who testified it was his duty to place the lanterns, stated that he set out eighty; that he had started his task about 4:30 p. m. and had completed it before the accident occured; and that he had placed the lanterns about 150 feet apart on each side and in the middle of the runway, so that they were actually staggered approximately 50 feet apart for the entire length of the runway. Other witnesses corroborated this witness' testimony as to the number, and several stated that the plane's wing passed directly over one light as it taxied upon the runway.

The issue of whether or not the defendant was negligent was submitted to the jury under appropriate instructions. While no charge expressly stated that the municipality was required to exercise the same degree of care as a private individual and hence would be liable in like manner for a failure to conduct itself accordingly, the charges clearly and unambiguously imposed the same duties and liabilities upon defendant as a private proprietor would be required to adhere to, and left no room for indulgence in any presumption that defendant might be exonerated from liability on the ground it was a governmental body.

The second issue, as framed by the pleadings, was whether or not the plaintiff contributed to his accident. It is a well established principle that contributory negligence is an affirmative defense, and that the burden of proving it is upon the defendant, unless the plaintiff's evidence itself shows contributory negligence. Hainlin v. Budge, 56 Fla.

342, 47 So. 825; White v. Hughes, 139 Fla. 54, 190 So. 446. If the plaintiffs' own case shows that a factual presumption of contributory negligence is plainly inferable from the evidence adduced, however, the burden of proof is shifted and it becomes the duty of the plaintiff to remove such presumption. Louisville & N. R. Co. v. Yniestra, 21 Fla. 700; Greiper v. Coburn, 139 Fla. 293, 190 So. 902. Plaintiffs contend there is no presumption of negligence on their part inferable from the evidence adduced by them, and therefore the trial court erred in failing to charge the jury that the burden of proof upon this issue was upon the defendant.

This being a case of first impression in this State, we must determine what degree of care an aviator is required to exercise in the operation of his craft. Looking to the general law, we find the authorities are unanimous in the following view:

"In the absence of statutes covering the operation and management of airplanes at the time and place of an accident, specifically applicable to the issue of negligence in the operation thereof, the rules of law applicable to torts—the ordinary rules of negligence and due care—obtain. Thus, the rule of the common law that every person shall use ordinary care not to injure another, that is, such care as the great mass of mankind would use under the same or similar circumstances or such care as the ordinarily prudent person would use under the same or similar circumstances, applies. An aviator is under no duty to use the highest degree of care that men of reasonable diligence or foresight ordinarily exercise in the operation of airplanes, but is bound only to use ordinary care, although here, as in any other case, ordinary care differs under the circumstances. The care must be commensurate with dangerous consequences to be reasonably apprehended; it may be a very high degree under some circumstances and of a slight degree under others."

6 Am. Jr. 16, Aviation, Sec. 23. See also Parker v. James E. Granger, Inc., 4 Cal. (2d) 668, 52 P. (2d) 226; 6 Am. Jur. 19, Aviation, Sec. 28; 2 C. J. S. 907, Aerial Navigation, Sec. 19, and cases cited therein.

Did the pilot, then, exercise such care as was commensurate with the circumstances? His testimony shows that he failed to make any attempt to obtain official and accurate information as to the condition of the field which he knew was under construction prior to taking off from Jacksonville. In his testimony, the pilot stated that as he partially circled the airport he "wasn't over the field" at any time, showing he made no attempt to familiarize himself with the dangerous areas or to ascertain where they were. He stated he had had a plan of landing (and it was shown that had he followed that course he had originally decided on he would probably have landed safely), but changed it just before putting the plane on the ground because he didn't see any lights in the center of the field although his vision was blocked directly forward by the plane's motor.

We think there is ample evidence of contributory negligence to be gleaned from the plaintiff's own testimony, and therefore the burden was shifted to the plaintiff to remove the presumption or show exonerating circumstances. Louisville & N. R. Co. v. Yniestra, *supra;* Greiper v. Coburn, *supra.* As a practice, it should seem that common sense would require a careful pilot to obtain in advance such information available, from reliable sources, as would enable him to determine the condition of the field which is his destination; and if the circumstances indicate that. dangers not ordinarily encountered are to be apprehended, as in the case at bar, prudence should demand such a course. The evidence in this case shows that a pilot could ignore this practice, however, and still exercise that care and caution required in landing at an airport under construction by

observing the procedure known as "dragging the field;" that is, by flying over the field at a reasonably low altitude so that obstructions which would be hazardous to a landing plane might be spotted. One witness, who was also a pilot, testified this was a rule or general practice which airmen followed. This witness also said he thought the plaintiff exercised "poor judgment," and that such a landing as was made could not be justified unless the pilot had been "familiar with the field on a local flight and knew the condition of the field."

It has been held that a pilot, who attempts to land at an airport with the sun in his eyes so that he is unable to see whether the runway is clear, is guilty of contributory negligence as a matter of law for not having a "sufficient lookout" (that is, for not having first flown over the field to ascertain if there were any hazards), so as to defeat the right of the owner of the plane to recover from the airport proprietor for damages to the plane on its alighting on a hayrake on the landing runway. Davies v. Oshkosh Airport, 214 Wis. 236, 252 N. W. 602, 99 A. L. R. 183. And, in Read v. New York City Airport, 259 N. Y. S. 245, 145 Misc. 294, a pilot, taxiing a plane down a runway after giving a "casual" glance down the field, was held precluded from recovering for damages to his plane occasioned by a collision with a truck standing on the field, on the ground that he was contributorily negligent.

It is stated that the "things which a pilot operating a plane with that degree of care which is commensurate with the situation and circumstances must consider include the weather conditions, the wind, the visibility, the type of plane . . . and the place where and the altitude at which a turn or descent is attempted. . . ." 6 Am. Jur. 19, Aviation, Sec. 28. We feel that the plaintiff's own testimony shows he failed to fulfill his duties and responsibilities in the operation

of the plane on this occasion. It shows he failed to ascertain as best he could that the course of descent he chose was clear; it shows he failed to consider and keep in mind the fact that this type of plane had a "blind spot;" it shows he failed to anticipate and apprehend the dangers, reasonably foreseeable, which a field at sundown and under construction might have. Therefore, there was no error in refusing the instruction as to the burden of proof requested by the plaintiff (See Texas & N. O. Ry. Co. v. Rooks [Texas, 1927], 292 S. W. 536) or if there was, it was, under the evidence in this case, harmless error.

It is lastly urged by plaintiffs that the verdict found by the jury is contrary to the evidence. We have carefully examined the exhibits and complete testimony, and considered the instructions given, which we find were appropriate and fair, and there is nothing to indicate that the jury were not governed by the evidence which substantially supported the verdict.

The judgments in each of these two cases are therefore affirmed.

WHITFIELD, TERRELL, CHAPMAN and THOMAS, J. J., concur.

BUFORD and ADAMS, J. J., not participating.