GREGORIA ORTIZ, Plaintiff and Appellee, *v.* AMERICAN RAILROAD COMPANY OF PORTO RICO, Defendant and Appellant.

No. 8692. Argued April 27, 1943.—Decided June 3, 1943.

*Mariano Acosta Velarde, Federico Acosta Velarde,* and *Donald R. Dexter* for appellant. *R. Atiles Moréu* and *Francisco Capó Pagán* for appellee.

Mr. Justice de Jesús delivered the opinion of the court.

Dámaso Ortiz, a twelve-year old boy, was run over by one of the trains of the appellant on May 5, 1938, between 7:30 and 8 p. m., near Desvío Ferri in the ward of Machuelo Grande, Ponce. Several hours later, he died as a consequence of the injuries received. On May 5, 1939, his mother, the appellee, filed a complaint to recover the damages she alleged she suffered by reason of the death of said minor, basing her cause of action on the allegation which, as appears from the second amended complaint, can be thus summarized:

That the plaintiff is the sole and universal heir of her son; that on the date and place mentioned, the defendant, a domestic corporation, through its duly authorized employees, operated a freight train; that the engineer who conducted the locomotive, Vicente Bermúdez, failing to exercise the proper care, drove locomotive No. 41 in such a careless and negligent way that it hit Dámaso Ortiz, the wheels of said locomotive running over the right knee and thigh of the boy, who, after being taken to the Tricoche Hospital, died a few hours later.

In specifying the acts of negligence charged to the engineer of the locomotive, the plaintiff alleged that the engineer did not take any precaution whatsoever to avoid the accident; that he was driving the locomotive without using any warning

apparatus whatsoever and at an exaggerated speed; that, as a result of said accident, the plaintiff has been deprived of the love and aid of her deceased son and has suffered mental anguish, and estimates the damages suffered in the amount of $2,500, asking judgment to be entered for said amount plus costs and a reasonable sum for attorney's fees.

The demurrer filed by the defendant having been dismissed, the defendant then filed its answer in which it denied the allegations of the complaint and under the title of "New Matter" alleged:

(a) That the action, at the time it was exercised, had prescribed, according to subdivision 2 of §1868 in relation with §§8 and 1802, subdivision 3 of §1860, and §1869 of the Civil Code. The defendant bases its contention in that, as the accident occurred on May 5, 1938, and the complaint was filed on May 5, 1939, more than a year had elapsed from the time the plaintiff knew of the damages suffered, and that therefore the complaint fails to state facts constituting a cause of action.

(b) That there was contributory negligence on the part of the minor, which was the proximate and sole cause of the the accident.

(c) That on the date of the accident the minor Dámaso Ortiz, without the consent or knowledge of the defendant, climbed on one of the cars pulled by locomotive No. 41 and, while the train was passing by Ramal Barrancas, he fell or jumped from the place he occupied in the car, landing on the tracks where he was run over by one of the cars, and his right leg fractured. Lastly, that the defendant claims that it employed all the diligence of a good father of a family to avoid the accident.

At the trial and before the introduction of the evidence, the plaintiff moved for an amendment of her complaint to state that the defendant was a corporation organized under the laws of New York and not under the laws of Puerto

Rico, as had been erroneously alleged. Over defendant's objection, the court granted the amendment and the trial continued.

The complaint was sustained. The judgment was based on the following findings of fact and conclusions of law:

That the accident occurred at twilight; that the train was going at a high speed without blowing the whistle or sounding the bell, and that the engineer, knowing that children were accustomed to play in that place should have anticipated their presence, and failed to exercise due care to avoid the accident. That the theory of the trespasser is conditioned on the fact that in densely populated areas, where many people cross the tracks, the company must take special precautions. That the obligation of the defendant to adopt measures to avoid accidents is not limited exclusively to grade crossings. That notwithstanding the fact that the minor was twelve years old, he was still in the first grade of elementary school, and there does not appear from the evidence in the record that he was a bright child, everything tending to show that he was slow in his reactions and of low mental development. That contributory negligence is an affirmative defense to be raised by the defendant, and that the latter failed to introduce any evidence to sustain it, relying entirely on the evidence of the plaintiff with respect to said defense.

■ Did the court *a quo* err in permitting the second amended complaint to be amended at the commencement of the trial, to substitute the allegation that the defendant was a corporation organized according to the laws of Puerto Rico for the one that it was organized under the laws of New York?

No controversy exists as to the identity of the corporation sued and that which appeared at the trial. The train involved in the accident belonged to it and those who conducted it were its employees acting within the scope of their employment. There does not exist in Puerto Rico another railroad company with that name. No attempt was made to demon-

strate that the defendant suffered any prejudice whatsoever by reason of the order of the court allowing the amendment. Under such circumstances, it must be concluded that the lower court acted correctly in permitting the amendment. *Bahr* v. *American Railroad Co.*, decided May 17, 1943 (61 P.R.R. 885).

■■ Had the action prescribed on May 5, 1939, the date on which the original complaint was filed?

Plaintiff's cause of action was brought to recover damages for the death of her son. Therefore, it was not the date on which the plaintiff had knowledge of the occurrence of the accident, but the time she had knowledge of the death, when the cause of action arose in her favor and she was able to exercise it. It was alleged in the complaint that the accident had occurred on May 5, 1938, "more or less at 7:00 in the evening" and that the injured boy was taken to the Tricoche Hospital "dying . . . . hours later." The allegation thus stated is ambiguous. It is susceptible of two interpretations, to wit: that the death occurred on May 5, if the phrase "hours later" includes a number of hours insufficient to go beyond midnight of the day of the accident; or that it occurred on May 6, if said phrase is interpreted to the contrary. When an allegation is ambiguous, as is the case here, said allegation is interpreted in the sense least favorable to the party making it—as it is presumed that said party has stated its case in the way most favorable to its interests. We must therefore assume, for purposes of the demurrer, that the death of the minor occurred on May 5, 1938. *Aitken* v. *South-Southwest Finance Corp. of California*, 20 P. (2d) 1000; *Miller* v. *Price*, (Cal.) 284 P. 1035; *Goodfellow* v. *Barrit* (Cal.) 20 P. (2d) 740; *Vilardo* v. *Sacramento County*, 129 P. (2d) 165, *Feldesman* v. *McGovern* (Cal.) 112 P. (2d) 645. But §388 of the Political Code provides that the time in which any act, provided by law, is to be done, is computed by excluding the first day, and including the last, unless the last day is a holiday, and then it is also excluded. And com-

menting on §7 of the Spanish Civil Code, identical to §8 of ours, which provides the meaning that must be given in the statutes to the words "monhts," "days," and "nights," Manresa states, referring to the meaning of "year":

"The Code does not speak of years, but applying the principle in which its §7 is inspired, it seems that the year must be computed as comprising twelve natural months and consisting of 365 days, unless the law or the agreement referred to a definite year and the same is a leap year." *Comentarios al Código Civil*, vol. 1, p. 89.

According to the evidence, the plaintiff learned of the death of her son immediately after it had occurred, as she had been notified of the accident, and was for said reason in the Tricoche Hospital. Therefore, if we take the 6th of May 1938, as the starting point for the computation, that is, if we exclude the day of the 5th, in accordance with the cited Section of the Political Code, we find that the 365 days ended on May 5, 1939, and therefore, when the complaint was filed on this last date, the action had not prescribed. As a matter of fact, it seems desirable to state that death occurred in the first hours of May 6, 1938. This appears from the death certificate admitted in evidence.

The case of *González v. Pérez*, 57 P.R.R. 843, cited by the appellee, does not apply. It is sufficient to say that in said case the accident occurred on July 17, 1938, and the complaint was filed in January 1940, the injured plaintiff claiming that he did not know of the disability of his leg until 34 days after the occurrence of the accident. Such a long time had elapsed in excess of that granted by law to initiate the action at the time the complaint was filed on January 19, 1940, that it was not necessary for this court to consider the point now before us.

The two preliminary questions having been decided, we now pass to a consideration of the merits of the appeal.

■■ Are the findings of facts of the court sustained by the evidence? Are its conclusions of law correct?

According to the allegations of the complaint, at the time the accident occurred, the boy was standing on a country road which starts at a point on the road a certain distance from the grade crossing and continues alongside of the railroad tracks, continuing in another direction away from said tracks after passing the scene of the accident. This road, as appears from the photographs admitted without objection by the plaintiff, is not adjacent to the tracks on which the accident occurred. On the contrary, and according to the uncontradicted testimony of civil engineer Octavio Augusto Seda, a witness of the defendant, between the track and the road is the Ferri Sidetrack and from the center of the principal track, on which the train was travelling at the moment of the accident, to the nearest side of the road, there is a distance of 4½ meters (Tr. of Ev., p. 128). See also photograph marked defendant's exhibit C. It thus being physically impossible, if the boy was on the road in question, for the accident to have occurred unless a derailment of cars had taken place, which did not happen. Notwithstanding said allegation of the complaint, the witnesses for the plaintiff who testified as to the way the accident occurred, that is, Raúl Santiago, Reinaldo Gutiérrez, and Miguel Martínez Almodóvar, described it thus:

Raúl Santiago: He testified that when he was going to cross the grade crossing, he saw the train coming at great speed and stopped to let it pass. He did not hear any whistle or bell. It was dark and the locomotive had its lights on. He heard boys screaming and went to the place where the injured boy was, nearly sixty feet from the grade crossing. The witness was four meters from the grade crossing when he heard the train and noticed its proximity by the noise it made. When he arrived at the place where the boy was, there were five or six persons around the boy.

Reinaldo Gutiérrez: He testified that he lives about 100 feet from the road and that he saw Dámaso walking the tracks, as well as the locomotive which was coming at a fast pace. That the accident occurred at dusk, that he failed to hear

any alarm apparatus, as he was paying attention to his work, fixing a car in front of his house but that he heard the noise made by the locomotive. In the course of his testimony he made the following comentary: "I do not know what was the matter with the boy, I think he was blind and as there is a grade there even though they wanted to brake the engine the cars pushed it . . . . He must have been dizzy when he did not see the engine." When the witness went to see the injured boy, he noticed that he had a leg on the tracks and his body was lying on the outer side, away from the tracks. After the accident, the spur track was fenced. The place where the accident occurred is situated in a place where the tracks run in a straight line. The locomotive did not stop. When the locomotive ran over the boy, the latter was at a distance of about 100 feet from the grade crossing. The boy and the train were going in opposite directions. From the time the witness saw the boy until the time the locomotive hit him, the boy walked ten paces. That the boys were playing in the yard of the witness' house and that the only one who was inside the tracks was Dámaso Ortiz; that the road which passes near the tracks is from five to six feet away from it; that the place where the accident occurred is a suburb and if the boys wanted to, they could get inside the tracks.

Miguel Martínez Almodóvar: The witness had been standing for half an hour on the grade crossing. It was dark. He did not hear any signaling apparatus but noticed that the locomotive was coming by its lights, which could be seen from a distance, and by the noise it made After the locomotive passed, a boy came to tell him that the train had killed somebody. The place of the accident is farther up the tracks than the grade crossing. When he arrived at the place where the boy was, he found that the boy had his legs inside the tracks, while his body was lying outside the tracks. That the boy was not a resident of said ward, and that he was walking the tracks when the locomotive ran over him. The

witness also testified that he came to the conclusion that the locomotive was coming at a high speed by the noise it made.

Rafael Rivera, a witness for the defendant, on cross-examination by counsel for the plaintiff, testified in relation to the custom of playing at the place of the accident:

"Q. And did you use to play hide and seek there?
"A. In front of that place.
"Q. In front of the tracks?
"A. In front of the house.
"Q. Where the road that runs next to the tracks start?
"A. Yes, sir.
"Q. Did you use to play there every day?
"A. Sometimes, in the afternoon.
"Q. From five to seven in the evening every afternoon?
"A. We played." (Tr. of Ev., 159.)

We must bear in mind, in connection with this testimony, that the road starts on the highway at a distance of around thirty meters from the grade crossing, and that there are two houses between the junction of the road and the highway and the grade crossing, one of said houses belonging to the gate-keeper. (Tr. of Ev. 138.) We must also bear in mind that from the grade crossing to the scene of the accident there is a distance of 42 meters. (Tr. of Ev. 125.)

The evidence of the defendant tends to show, through statements made by the boy to some of its witnesses, that the injured boy had climbed on one of the cars of the train and while passing from one car to another he fell down, being run over by the wheels of one of the cars.

We must see now if by giving entire credit to the evidence of the plaintiff relative to the accident, the findings of facts and of law on which the court a quo based its judgment, are sustained by the evidence.

That the accident occurred at dusk and that the locomotive had its lights on, is perfectly sustained by the evidence. Two witnesses of the plaintiff testified that the train was coming at a high speed and without sounding any warning apparatus.

Those of the defendant who witnessed the accident, among them two who were not its employees, sustained that the train was coming at a low speed and that they heard it sound its whistle and bell. This statement of the witnesses of the defendant is sustained to a certain degree by the fact that the gatekeeper, whose house is forty-two meters from the site of the accident, received warning of the approach of the train in time to permit her to lay the chains on both sides of the grade crossing. But as the evidence was conflicting and the court *a quo* gave credit to that of the plaintiff, we will accept that the train was coming at great speed and that it did not make use of its warning apparatus. Nevertheless, we can not accept as correct the finding of the lower court to the effect that the engineer had knowledge that at the place of the accident children used to play and that he should have anticipated the presence of these and should have exercised due care to avoid the accident. Only one witness of the plaintiff, Reinaldo Gutiérrez, testified that on that afternoon the boys were playing in the witness' yard. Another witness of the defendant, Rafael Rivera, who on the date of the accident was twenty years old, testified, on cross-examination by counsel for plaintiff, that he and other boys used to play *some afternoons* in front of the house. The mere fact that some boys used to play in a place more or less distant from the railroad tracks did not impose any duty whatsoever on the employees of the defendant to anticipate that a the moment the train passed by that place there would be boys on the railroad tracks. We must not forget that the trains have an itinerary they must follow, so they must be obliged to reduce their speed and take extraordinary precautions only when there exists a real and reasonable motive to justify it. Besides, the fact that *some afternoons* the boys played in said place is not so ostensible as to justify the conclusion of the court *a quo* to the effect that the employees of the defendant knew of these games and therefore were under a duty to take measures of precaution. From the evidence it does not ap-

pear that the employees of the defendant had knowledge of said games. On the contrary, the uncontradicted testimony of said employees show that they knew of the accident, for the first time, when arrested in Ponce while they were lubricating the locomotive to start for Guayanilla.

The conclusion of the lower court to the effect that everything tends to show that the boy was of slow understanding and of little mental development does not find support in the evidence. The proper thing to expect is that every person has at least a normal intelligence and therefore, it must be presumed, while nothing to the contrary is shown, that this boy was not mentally defective. It is true that when the accident occurred the boy was twelve years of age and that, according to the testimony of his mother, he was in the first grade of elementary school, but this does not necessarily imply that he was "of slow understanding and little mental development." There are persons who remain illiterate all their lives and who, in spite of the fact that they receive no education, have natural intelligence, and from the mere fact that they do not know how to read and write, we cannot conclude that they are mentally defective. The reason for their lack of education may be due, as is currently the case, to a lack of opportunity to receive it. The fact that the boy was walking the tracks in the way he did on the day of the accident does not necessarily mean that he had any mental defect, as we constantly see that intelligent persons and even cultured people incur in acts of negligence that sometimes cost them their lives.

All the evidence shows that the boy was a trespasser, as he had not been invited by the company to walk on the tracks. He was not conducting any business for the company at the moment, nor had he any express or tacit license to walk on the defendant's tracks. The minor being a trespasser, the only duty with respect to him that the employees of the company had was that, once his presence was discovered, on the site of danger, they were required to use

reasonable care to avoid causing him injury. The engineer, as well as the fireman, have other duties inherent to their respective employments. There was no grade crossing, nor the place was a densely populated area, as was erroneously declared by the lower court, for there were only two houses there, one of them being that of the employee of the defendant. Neither had they any other reason to anticipate the presence of any person. They were not under the obligation of constantly looking toward the tracks to discover any trespasser who might be walking on them. ■ Neither was there any duty of the company to maintain a lookout in the locomotive to constantly watch the tracks; ■ nor was there any duty of its employees to sound any warning apparatus except at the grade crossing, unless they saw or had reason to believe that they were going to cause injury to some person or animal on the tracks or about to go on them.

It might perhaps be argued that, as the accident occurred at a distance of forty-two meters from the grade crossing, the defendant was under the obligation to sound the warning apparatus and to reduce speed. Said argument would have a certain strength if the accident had occurred at the grade crossing, as the sounding of the alarm or the warning apparatus is done with the purpose of warning those who cross the tracks at said place. But this was not a duty that the defendant owed to the said minor. See *Ferrer and Son* v *American Railroad Co.*, 39 P.R.R. 36. But even though it might have been its duty, the lack of compliance with it was not the proximate cause of the accident as, according to the testimony of the witness of the defendant, Raúl Santiago, who was standing on the road at a distance of over four meters from the grade crossing, he noticed the approaching of the train by the noise it made and by the light of the engine that illuminated the tracks. Besides, if the boy who was walking facing the locomotive, could not hear the noise of the train and was not attracted by the light of the locomotive's headlight—which necessarily had to hurt his eyes intensely—we

do not see what influence on the situation it would have had to sound the whistle or bell.

■ There is no law establishing a maximum speed except at grade crossings. The duties imposed by law on the defendant are stated in subdivision (*q*) of §3 of the Public Service Act of Puerto Rico, which reads thus:

"(*q*) *Safety Devices for Crossings, etc.*—If a railroad company, to contract and maintain chains, gates, or other suitable protective devices, at all grade crossings of insular public roads and at all such other public crossings as the commission may designate, and subject to rules, regulations and orders of the commission, to fence in or otherwise properly guard or protect its tracks at such places as the commission may designate, so as to keep animals from entering upon such tracks; to provide its locomotives with bells and whistles *which shall be used upon approaching curves, tunnels, and road or street crossings and whenever necessary as a warning of the approach of such locomotives and trains which shall reduce their speed to a minimum on street crossings, and shall use, after sunset, such lights as may be necessary and the commission may determine.*" Laws of Puerto Rico, 1917, p. 448. (Italics ours.)

In the case of *McCarthy* v. *New York, N. H. & H. R. Co*, (C.C.A.) 240 Fed. 602, a father brought an action for damages against a railroad company for the death of his son, who was six or seven years of age. The evidence showed that the plaintiff lived in a house he had rented from said company. The lot on which the house was built extended up to the railroad tracks which were located at a distance of from 25 to 30 meters from the back stairs to the house. There was no fence whatsoever separating the tracks from the lot on which the house was built nor did the lease contract impose on the lessor the duty of building one. The boy went on the tracks at the moment the train was coming. As was testified to by the engineer, he saw the child when the latter was at a distance of 30 feet from the locomotive, and he applied the emergency brake and tried to stop as soon as he could. But as appears from his uncontradicted testimony, a train traveling at forty miles per hour can not stop within a distance

of less than 300 feet. The mother of the child testified that at the time of the accident she was visiting at a neighbor's house; that the house where she was had all the windows and the door fully open and that no warning signal had been used by the train. The engineer stated in his testimony that he blew the whistle as soon as he saw the boy on the tracks. In affirming the judgment dismissing the complaint, the court expressed itself thus:

"Any person who goes upon the premises of another is a trespasser, if he goes there out of curiosity or for his own purposes and without invitation, express or implied, and not in the performance of a duty to the defendant. A child of tender years may be a trespasser. (Citing authorities.) Although in *Kansas City Suburban Belt R. Co.* v. *Herman* (Kan. App.) 62 Pac. 543, it was held that a child four years old could not be a trespasser. And the same court in *Missouri Pacific R. Co.* v. *Prewitt*, 7 Kan. App. 556, 51 Pac. 923, held that a child two years old could not be a trespasser. The general rule, however, is that the tender age of the child cannot have the effect of raising a duty where none otherwise existed, and the fact that a trespasser is a child does not impose on the owner of property any duty to keep his premises safe. (Citing authorities.)

"The general rule is that a railroad company is under no duty or obligation to exercise active vigilance to provide against injury to trespassers on its tracks or right of way until their presence is known. (Citing authorities.) As to them the rule is that it must exercise reasonable care to avoid injuring them after discovering their peril. (Citing authorities.) And as a rule the railroad owes no greater duty to a child who is a trespasser than it owes to an adult. (Citing authorities.)

"The conflict of evidence under the circumstances is not important, for the reason that there is no evidence in the record which shows that the engineer saw the decedent before he was within 30 feet of him, and there is no evidence in the record which made it the duty of those in charge of the engine to have been looking ahead as they were approaching the locus in quo . . . .

"    *        *        *        *        *        *        *

"In a number of cases courts have held that, when the evidence shows that there is reason to expect that persons may be upon the track at the place where an accident occurs, the company is liable for the neglect of the engineer to look out for them even if he did

not see them. (Citing authorities.) But if no reason exists for expecting that persons may be on the tracks, and the engineer did not see the person who was injured, then the company is not liable for his negligence in not looking out for him. (Citing authorities.)

"The company may be liable to a trespasser for its failure to exercise reasonable care to discover and avoid injuring him when it has reason to anticipate his presence. But there is no evidence in this case which indicates that this defendant had any reason to expect any person would be upon the tracks where this accident happened."

Ever since 1905, this court in the case of *Pérez* v. *The American Railroad Co. of P. R.*, 9 P.R.R. 196, through Mr. Justice McLeary, has established the rule in this jurisdiction, stating it in the following way:

"In the first place, what position did the deceased occupy in reference to the defendant, the railroad company, and what were the rights and obligations existing between them? Had the crossing been a public highway, and the deceased been traveling along the road in a lawful manner, the rights of the traveler and the railroad company would have been reciprocal and equal; but, inasmuch as the railroad train is necessarily confined to its tracks and a pedestrian can govern his movements in such a way as to avoid a collision more readily than the engineer can adjust his train to a like purpose, the obligation is imposed on the pedestrian to give the road and take reasonable precautions for his own safety. (*Morrisey* v. *Eastern R. R. Co.*, 126 Mass., 377; 30 Am. Rep., 687.) But when a pedestrian is walking a railroad track, or crossing the same at a private crossing, without permission from the owner of the land or of the railroad company, he is a trespasser, and is only entitled to such care on the part of the employes of the railroad company as will avoid recklessness and prevent the wanton infliction of an injury. A trespasser upon a railroad must take extraordinary precautions for his own safety, and, unless recklessness or gross carelessness or want on disregard of his peril is shown to have been indulged in by the employes of the railroad company, neither the injured person, nor his heirs, if death ensues, can hold the railroad company responsible for damages caused by a collision. (Citing authorities.)" (P. 201; italics ours.)

"There seems to be among the common people of this north coast an impression that a railroad track is a public highway, and that every one has the right to walk upon it, or to ride upon it at his

pleasure, and sometimes pedestrians seem to hesitate as to whether they should give the right of way to the engine or not. It is high time that it should be understood in this Island, as it is on the Continent, that the use of a railroad track is reserved to the railroad company and to the owner of the soil, exclusive of the public everywhere except where it is crossed by a public road. · This rule is necessary, not only for the protection of property, but for the preservation of human life. . ." (Pp. 202–3.)

See also *Helring* v. *Delaware & Hudson Co.* (C.C.A. 1931), 54 F. (2d.) 493.

▬▬▬▬ In our judgment the evidence that the court *a quo* had before it failed to show that the defendant had failed to comply with any duty towards the minor and, therefore, we must decide that the defendant was not guilty of negligence. [11] But even if it had been negligent, it would not have been liable for the accident, because the evidence of the plaintiff shows that the boy was guilty of contributory negligence, [12] the defendant being able to rest exclusively on the evidence of the plaintiff to sustain said defense. See the note entitled *Burden of Proof as to Contributory Negligence,* which appears in 33 L.R.A. (N.S.) 1085, especially at page 1183, and the cases of *Emanuel et ux.* v. *Wise et ux.* (Wash. 1941), 118 P. (2d) 969; *Cruse* v. *Dole* (Kan. 1942), 124 P. (2d) 470; and *Peavey* v. *City of Miami* (Fla. 1941), 1 So. (2d) 614, 618.

The appeal must be sustained. The judgment appealed from must be reversed and a new judgment entered, dismissing the complaint with costs against the plaintiff.

Mr. Chief Justice Del Toro did not participate herein.