**JEWELL RIDGE COAL CORPORATION, a corporation, and Jewell Ridge Coal Sales Company, Incorporated, a corporation, Plaintiffs,**

**v.**

**CITY OF CHARLOTTE, NORTH CAROLINA, a municipal corporation, and Al S. Quinn, individually and as manager of Douglas Municipal Airport, Defendants.**

Civ. A. No. 1506.

United States District Court
W. D. North Carolina,
Charlotte Division.

Argued March 30, 1962.

Decided April 14, 1962.

James B. Craighill, Thomas A. Lockhard and John B. Ingle, Charlotte, N. C., for plaintiffs.

John H. Small, Charlotte, N. C., for defendants.

CRAVEN, District Judge.

This is a civil action brought to recover for property damage to Plaintiffs' airplane suffered when it ran into broken

asphalt and a ditch at Douglas Airport in Charlotte, North Carolina.

The case was tried to the Court without a jury, and after hearing the evidence and visiting the scene, and after hearing arguments of counsel and considering their briefs, the Court finds the facts to be as follows:

1. Jewell Ridge Coal Corporation and Jewell Ridge Coal Sales Company are both corporations organized under the laws of the State of Virginia, and have their principal offices and places of business in that State.

2. The Defendant, City of Charlotte, is a municipal corporation organized and existing under the laws of the State of North Carolina, and the individual Defendant, Al S. Quinn, is a citizen and resident of Mecklenburg County, North Carolina.

3. The amount in controversy in this action, exclusive of interest, exceeds the sum of $10,000.00.

4. On April 16, 1958, and for some considerable time prior and subsequent thereto up until the time of trial, Defendant City has owned, maintained and operated an airport located southwest of the City of Charlotte in Mecklenburg County, North Carolina, which is known as Douglas Municipal Airport.

5. The airport is owned, operated and maintained by the City for the use of commercial air lines and private airplanes.

6. Since January 1956, and up until the trial, the Defendant Quinn was the general operating manager of Douglas Municipal Airport, and he was the person directly in charge of the operations and maintenance of same. He had charge of the general operations of the physical properties of Douglas Municipal Airport, and as the Airport Manager he was the duly appointed agent and employee of the Defendant City, and at all times mentioned herein he was acting in the course of his employment and the discharge of his duties as an agent and employee of the City, and as Airport Manager.

7. On April 16, 1958, and at the time of the incident hereinafter mentioned, the corporate Plaintiffs were jointly owners of a twin engine aircraft known as a Beechcraft Twin-Bonanza.

8. At all times mentioned herein on April 16, 1958, Charles L. Mock was employed by the Plaintiffs as an airplane pilot and was operating said Beechcraft Twin-Bonanza airplane as pilot, employee and agent of the Plaintiffs in the course of his employment and within the scope of his duties. He was an experienced pilot and had a commercial pilot rating, instrument rating, and was duly licensed.

9. Sometime shortly before 6:50 p. m. on the afternoon of April 16, 1958, Pilot Mock landed his airplane on Runway 5 at Douglas Municipal Airport and taxied to and around the passenger finger of the Terminal Building and thence to the end of Runway 36 near the Cannon Aircraft facility for the purpose of picking up passengers; from this place he saw his passengers waving to him from some point in front of Southern Flight Service, which is located North of the Cannon Aircraft facility, and he then taxied along the edge of Runway 36 to the place where the passengers were and took them aboard.

10. After picking up the above mentioned passengers, Pilot Mock radioed the Control Tower for a clearance for a take-off north bound. In response the Control Tower gave him clearance to Runway 5, together with wind direction, altimeter settings, and other routine information.

11. Between the point where the airplane was then located and the Terminal Building there was Runway 36 (which ran North and South) and a paved area which had been installed by the United States Army Air Force during World War II. The entire area between Southern Flight Service area and the Terminal Building was covered with pavement, except for the fact that approximately three months or more before April 12, 1958, the Defendant Quinn, acting for the Defendant City, and on the advice of consulting engineers, had caused a strip of

the pavement, estimated by the Defendant Quinn as being approximately 18 to 35 feet wide, to be broken up in order to improve the drainage for the paved apron immediately surrounding the Terminal Building, and in addition a shallow ditch or depression approximately 12 to 14 inches deep had been dug in the portion where the pavement had been removed to permit drainage to a storm sewer. The ditch lay between Runway 36 and the Terminal Building. Most of the pavement which had been broken up had been removed, but some of it, according to the Defendant Quinn's testimony, had been left "as a warning" to pilots who might be in the area. The ditch and broken asphalt area was dangerous and unsafe for taxiing aircraft.

12. Runway 36 was marked on each side by lights located approximately 200 feet apart and large yellow X-marks, or crosses, 200 to 300 feet apart on each side of its entire length. There were also half automobile tires painted yellow located around the runway lights. The X-marks and the tires and the lights were placed there to indicate that the runway (which was originally 300 feet wide) had been narrowed to a strip 150 feet wide in the center of the former 300 foot wide runway. Visiting the scene discloses that the location and effect of the X-marks was not such as to indicate that any particular area was "closed" in the sense that it was non-operational for purposes of taxiing aircraft.

13. Between the place where the airplane was when it received clearance to Runway 5 and the Terminal Building, there was a slight rise or crown at about Runway 36, and then the surface sloped downward in what appears to be an 8 foot drop to the level of the apron around the Terminal Building itself. This was a gentle slope to within about 20 to 25 feet of the ditch itself, and then it dropped off a little more sharply until it came to the ditch itself. The location of the ditch was in an operational area for taxiing purposes, or in any event, appeared to be, and the defendants knew or should have known it would so appear.

14. It was necessary to cross Runway 36 to get to Runway 5 and to go around and beyond the passenger finger end of the Terminal Building or north concourse, and to Pilot Mock, from the place where he picked up the passengers and received the clearance from the Control Tower, it appeared that there was an unbroken expanse of pavement directly and all the way to the Terminal Building. It appeared to him to be "a large expanse of asphalt" or a "complete sheet of solid asphalt", and he could not see the drainage ditch until he was close on it.

15. There were no barricades, flags, reflectors or other warning devices of any kind to mark the drainage ditch or warn planes to stay away from it, and in fact, the only markers of any kind between the place where the airplane started taxiing and the drainage ditch were the lights and the X-marks previously mentioned which marked the edges of Runway 36; no notice, official or otherwise, of a hazardous condition had been published to pilots.

16. There was a yellow taxi line approximately 6 inches wide from the area of the Southern Flight Terminal, leading in an approximately northerly or northwesterly direction toward a taxiway which led in a round about way ultimately to the end of Runway 5, but it is not shown that this yellow line was in the immediate vicinity of where the airplane was located or within the vision of the pilot when he started taxiing on the occasion in question.

17. There is no regulation which requires aircraft moving around in ramp areas, loading areas, or parking areas to follow yellow lines, and while it is customary for pilots to follow a yellow line in parking, loading, or ramp areas if it leads to a point to which they wish to get their aircraft, pilots customarily disregard yellow lines and take a direct course to the point to which they are going if such a course is open. Over a period of years aircraft have customarily taxied throughout the area. The Defend-

ants knew, or should have known, of the custom and practice.

18. It is customary for hazardous areas of an airport to be marked and for ditches on usable areas to be marked with flags, reflectors, barricades, or in some other clearly discernable way.

19. Pilot Mock started taxiing the airplane in a direct line, and almost due West, across the above mentioned paved area, intending to go around the passenger finger end of the north concourse of the Terminal Building at approximately 6:49 p. m.

20. Pilot Mock taxied his airplane at the speed of approximately 20 miles per hour, which speed was affected somewhat by a 15 to 25 mile per hour tail wind, which tail wind also affected to some extent his ability to quickly slow down. He followed the shortest and most direct route to Runway 5, crossing Runway 36 and heading for the end of the passenger finger of the Terminal Building where he would then be able to follow a taxiway running parallel to Runway 5 to the end of it. There is no evidence as to what extent, in terms of feet or inches, if at all, the broken pieces of asphalt rose above the surface of the unbroken portion. The Court is unable to find that they stuck up sufficiently in height to constitute warning to the pilot. Being of the same color and density as the unbroken asphalt, they were not readily discernable in the conditions of light at the time of day to one headed West. Until too late to stop his airplane the area in front of Mock appeared to be a smooth sheet of solid asphalt, and the Defendants knew, or should have known, it would so appear. When he saw the broken pieces of asphalt and the ditch he tried to stop but was unable to do so, and the nose of the airplane turned up in the ditch.

21. Mock was traveling at a reasonable rate of speed, and was keeping a reasonably prudent lookout in the direction of his travel, and was using ordinary care to keep his airplane under control.

22. As a proximate result of running into the ditch the airplane sustained ex-

tensive damage requiring repair and replacement of portions. Repairs cost $11,411.02 after making allowance for certain improvements which were included in the repair bill. The difference between the fair market value of the Plaintiffs' airplane before and after the event was $15,000.00.

23. The charter of the City of Charlotte, as enacted by the Legislature of the State of North Carolina, section 59, provides as follows:

"Notice of Damages

"Sec. 59. No action for damages against said city of any character whatever, to either person or property, shall be instituted against said city unless within ninety (90) days after the happening or infliction of the injury complained of, the complainant, his executors or administrators, shall have given notice to the city council of said city of such injury in writing, stating in such notice the date and place of happening or infliction of such injury, the manner of such infliction, the character of the injury and the amount of damages claimed therefor, but this shall not prevent any time of limitation prescribed by law from commencing to run at the date of happening or infliction of such injury or in any manner interfere with its running."

24. The Plaintiffs did not give any notice of a claim for damages to the City Council of the City of Charlotte within 90 days as required by section 59 of the charter of the City of Charlotte, but on the contrary, gave no notice until December 31, 1958.

Upon the foregoing Findings of Fact the Court makes the following Conclusions of Law:

1. The Court has jurisdiction based on diversity of citizenship and the amount in controversy. 28 U.S.C.A. § 1332.

2. Under the doctrine of respondeat superior the Defendant Quinn's conduct and his acts and omissions in the operation of the airport are imputable to the municipal Defendant.

3. The Defendant Quinn, personally, is responsible in law for his acts and omissions in the operation of the airport.

4. Defendants were guilty of negligence in the operation and maintenance of the airport and its facilities, which negligence was a proximate cause of damage sustained by Plaintiffs to their airplane.

5. Under the doctrine of respondeat superior Pilot Mock's conduct and acts and omissions in the operation of the airplane was imputable to the Plaintiffs.

6. Pilot Mock was not guilty of contributory negligence proximately causing damage to the airplane, either as a matter of fact or of law.

7. The operation and maintenance of the Douglas Municipal Airport and its facilities was a proprietary or non-governmental function or undertaking of the Defendant City for a public purpose, and for which the municipality may be held liable in tort for negligence in the operation thereof. Rhodes v. City of Asheville, 230 N.C. 134, 52 S.E.2d 371 (1949); G.S. of N.C. § 63–5.

8. Plaintiffs are not entitled to recover from the Defendant municipality because of their failure to give notice to the City of Charlotte of their claims for damages within 90 days after the happening of the event. Sec. 59 of the charter of the City of Charlotte (Chapter 366 of the Private Laws of North Carolina, 1939).

9. Plaintiffs are entitled to have and recover from the Defendant Quinn, in his individual capacity, the sum of $15,-000.00 by way of compensation for damages sustained to their airplane.

■ The law applicable to this controversy is that of North Carolina. In the absence of statute, the ordinary rules of negligence and due care obtain with respect to the operation of aircraft. Scarboro v. Pilot Life Insurance Co. (1955) 242 N.C. 444, 88 S.E.2d 133, 54 A.L.R.2d 407; Bruce v. Flying Service, 231 N.C. 181, 56 S.E.2d 560, 12 A.L.R.2d 647; 6 Am.Jur., Aviation, sec. 60. The facts of this case are not within the limited scope of the germane North Carolina statute. See: G.S. of N.C. § 63–15. It is of no importance since the statute appears to merely declare the common law.

■ The question of negligence of the Defendants does not require extended discussion. Suffice it to say that Defendants owed a duty to Plaintiffs to keep operational areas of the airport in a reasonably safe condition for the operation of aircraft. Digging the ditch and breaking up the asphalt invoked a correlative duty to give reasonably adequate warning of the unsafe condition.

If it be assumed the area was non-operational it did not have that appearance. Such an assumption negates only the duty to keep in a reasonably safe condition. There remains the duty to give notice to persons endangered by the appearance of an operational area which in fact is not operational. If Defendants knew, or in the exercise of due care, should have known that this area would appear to the pilot as a smooth expanse of asphalt for taxiing purposes then they should have given him some sort of reasonable notice that the appearance was false and deceptive. Failure to do so is negligence. Peavey v. City of Miami, 146 Fla. 629, 1 So.2d 614, 617 (1941); Price v. City of Monroe, 234 N.C. 666, 68 S.E.2d 283. Whether there was such failure is a question of fact.

■ Defendants strenuously contend that Plaintiffs were contributorily negligent both as a matter of law and fact. On this issue the burden of proof is on the Defendants. Rosenblatt v. United States, D.C., 112 F.Supp. 114. Ordinarily, it is a question of fact for the jury to say whether or not a motorist was keeping a reasonably careful look-out to avoid danger. Williams v. Frederickson Motor Express Lines, 198 N.C. 193, 151 S.E. 197.

■ Where different conclusions or inferences might reasonably be reached under the evidence in aviation cases, the question of contributory negligence is for the jury and is a question of fact rather than law. 6 Am.Jur., Aviation,

sec. 80; Vee Bar Airport v. DeVries, 73 S.D. 356, 43 N.W.2d 369, 17 A.L.R.2d 909.

The North Carolina Supreme Court has said no exact formula can be laid down and that practically every case must "stand on its own bottom". Weavil v. Myers, 243 N.C. 386, 90 S.E.2d 733.

The Legislature of North Carolina has seen fit to provide as to automobiles that outrunning one's range of vision shall *not* be considered contributory negligence per se in any civil action. G.S. of N.C. § 20–141(e).

■ Defendants contend Mock was negligent in operating his airplane at a speed greater than was reasonable and prudent. Was 20 miles per hour too fast? In view of the tail wind would it have made any difference if he had been going slower, e. g., 15? Is 15, or 20, a negligent speed for a taxiing aircraft on what appeared to be a smooth and open expanse of asphalt? Assuming this to be negligence, was it a proximate cause in view of the tail wind?

These are questions upon which reasonable men can honestly differ and indeed upon which opinion evidence might have been properly offered as to customary and usual speeds of taxiing aircraft under like circumstances.

Mock was under a duty to keep a lookout in the direction of travel and to see what he ought to have seen. Taylor v. Brake, 245 N.C. 553, 96 S.E.2d 686.

■ Should he have seen the broken asphalt sooner than he did? How much did it stick up from the smooth surface? No one ever said. Photographs depicted it but of course weren't taken at the time. And photographs merely illustrate the testimony and are not themselves substantive evidence in North Carolina. Stansburg, N.C. Evidence, section 34.

But giving full weight to the photographs the height of the broken pieces of asphalt, in inches or feet, even as an estimate, is a matter of speculation, not possible of accurate determination by the trier of fact. Assuming, without knowing, that it stuck up 12 inches, was it negligence for Mock to not see it until too late to stop? Is he excused in part because it was the same color as the unbroken asphalt and because he faced a setting sun? If not excused, was his quickness of perception affected?

■ These, too, it seems to me, are questions upon which reasonable men can honestly differ. "Contributory negligence in cases of this sort is to be judged by the rule of reasonable prudence under all the circumstances of the case and not by arbitrary rule of thumb." United States v. First-Citizens Bank & Trust Co., 4 Cir., 208 F.2d 280.

I am not satisfied from the evidence and by its greater weight that Mock traveled faster than was reasonably prudent under the circumstances as they reasonably appeared to him at the time; nor am I satisfied that he failed to keep a reasonably proper look-out in the direction of his travel.

■ I therefore conclude that he was exercising ordinary care to keep his airplane under control. To hold otherwise, it seems to me, would put upon Mock a higher degree of care than that imposed by law.

■ It is beyond argument that the Defendant Quinn in his individual capacity had complete charge of the operation and maintenance of Douglas Airport and for any actionable negligence in the maintenance and operation of said airport Defendant Quinn would be liable in tort. Wachovia Bank & Trust Co. v. Southern Railway Co. (1939) 209 N.C. 304, 183 S.E. 620.

■ The notice requirement in the charter of the City of Charlotte by its terms does not purport to protect the Defendant Quinn as Airport Manager. He is granted no immunity by reason of the failure of the Plaintiffs to give the statutory notice.

■ The requirement of notice as a condition precedent to an action for damages against a municipal corporation is quite general and has been recognized as a constitutional power of the Legislature. 38 Am.Jur., Municipal Corporations, secs.

673–683; 63 C.J.S. Municipal Corporations §§ 922–930.

 The notice provision in the charter of the City of Charlotte has been held valid as a condition precedent of the bringing of a tort action. Graham v. City of Charlotte (1923), 186 N.C. 649, 120 S.E. 466. Webster v. City of Charlotte (1942), 222 N.C. 321, 22 S.E.2d 900.

Plaintiffs seriously contend that the notice provision does not protect the City in its proprietary operations but only in its governmental operations. The distinction has never been made by the Supreme Court of North Carolina. That Court has held in a number of cases that the giving of timely notice is a condition precedent to the right to maintain an action and that non-suit is proper unless the Plaintiff alleges and proves notice. Carter v. City of Greensboro (1949) 249 N.C. 328, 106 S.E.2d 564.

Whether a notice requirement applies to non-governmental functions of a municipality was considered in Collins v. City of Memphis (1936) D.C.Tenn., 16 F. Supp. 204. This appears to be the first and only decision of a United States Court on this subject. That Court, after exhaustively reviewing many decisions of State Courts, held that better reason sustains the view that no distinction between governmental and non-governmental activity of a municipality should be read by the Court into a clear-cut statute requiring notice of injury. It seems to me that section 59 of the charter of the City of Charlotte is equally clear-cut, containing as it does the language that "no action for damages * * * of *any character whatsoever* (italics mine) shall be instituted * * * unless * * *."

I am of the opinion that this notice provision applies and protects the City in its operation of a so-called non-governmental airport for a public purpose.

The Supreme Court of North Carolina has relaxed the rigidity of such protection to municipalities where claimant is mentally or physically incapable of giving notice within the statutory period.

Terrell v. City of Washington, 158 N.C. 281, 73 S.E. 888 (1912).

Instead of inability, physical or otherwise, to comply strictly with the notice requirement, Plaintiffs rely upon their ignorance of the rule. Whether such further relaxation of the rule may be had, it seems to me, is properly within the province of the Supreme Court of North Carolina. The decisions of that Court do not presently countenance such an exception to the rule.

Now, Therefore, upon the foregoing Findings of Fact and Conclusions of Law it is adjudged that the Clerk shall enter judgment:

1. That the Plaintiffs jointly have and recover judgment against the Defendant Quinn in the sum of $15,000.00.

2. That this action be dismissed as to the Defendant City of Charlotte.

3. That the costs of this action be taxed against the Defendant Quinn.